**In re PATIENT EDUCATION MEDIA, INC., Debtor.**

**Bankruptcy No. 97 B 41654 (SMB).**

United States Bankruptcy Court, S.D. New York.

June 30, 1997.

Reid & Priest, L.L.P., New York City (Marc E. Richards, Barry G. Magidoff, Craig Freeman, of counsel), for Debtor.

Randy M. Kornfeld, P.C., New York City (Randy M. Kornfeld, Frederick E. Schmidt, of counsel), Edward C. Greenberg, New York City, for David Katzenstein.

### MEMORANDUM DECISION REGARDING SALE OF ASSETS

STUART M. BERNSTEIN, Bankruptcy Judge.

Section 106 of the Copyright Act, 17

U.S.C. § 106,[1] grants the owner of a copyright, with certain exceptions not material to the current dispute, the exclusive right to exploit the copyrighted work. The issue presented is whether the debtor, Patient Education Media, Inc. ("PEMI" or the "debtor"), can transfer its nonexclusive license to use the copyrighted work over the copyright owner's objections. For the reasons that follow, the Court concludes that it cannot.

## BACKGROUND

For the most part, the relevant facts of this matter are not in dispute.[2] The debtor filed this chapter 11 case on March 14, 1997. The debtor was formed in 1994 to create and market patient educational products under the trademark TIME–LIFE MEDICAL ™. C. Everett Koop, M.D., former Surgeon General of the United States, became PEMI's medical director and Chairman of the Board, but has since resigned from these positions. PEMI's initial products included a library of thirty *At Time of Diagnosis* ™ patient education kits. Each kit related to a frequently diagnosed illness or medical condition and consisted of a 30–minute video and accompanying workbook. In October 1996, PEMI introduced a series of four specialized exercise videos under the name *RX–Exercise* ™ for people with arthritis, heart disease, stress and anxiety, and lower back pain.

In 1995, PEMI hired David Katzenstein, a professional photographer, to take photographs for use in the production of the videotapes. Katzenstein's photographs were eventually incorporated into the title and "bumper" (or transitional) sequences and as part of the set design seen on the videotape. It is undisputed that Katzenstein granted PEMI a nonexclusive license, unlimited as to time, to use the photographs for these purposes, and that the debtor still holds this nonexclusive license.[3]

In early 1996, the debtor and Katzenstein agreed to supplement and extend PEMI's right to use the 1995 photographs beyond what was granted in 1995. According to an invoice dated March 27, 1996, which both parties signed, the debtor agreed to pay Katzenstein $4,500.00 by April 5, 1996 and an additional $40,500.00 by April 22, 1996. In return, Katzenstein granted the debtor "the unlimited worldwide use of all images for one year plus the unlimited worldwide use, with no time limit specifically for packaging only. Photographer retains copyright to all images."[4] The debtor made these two payments, and the parties agree that the debtor still holds a nonexclusive license, unlimited in time, to use the photographs for packaging purposes. On the other hand, the unlimited rights granted for only one year have expired.

---

**1.** Section 106 provides:

Subject to sections 107 through 120, the owner of copyright under this title has the exclusive rights to do and to authorize any of the following:
(1) to reproduce the copyrighted work in copies or phonorecords;
(2) to prepare derivative works based upon the copyrighted work;
(3) to distribute copies or phonorecords of the copyrighted work to the public by sale or other transfer of ownership, or by rental, lease, or lending;
(4) in the case of literary, musical, dramatic, and choreographic works, pantomimes, and motion pictures and other audiovisual works, to perform the copyrighted work publicly;
(5) in the case of literary, musical, dramatic, and choreographic works, pantomimes, and pictorial, graphic, or sculptural works, including the individual images of a motion picture or other audiovisual work, to display the copyrighted work publicly; and

(6) in the case of sound recordings, to perform the copyrighted work publicly by means of a digital audio transmission.

**2.** To the extent they were, the Court conducted an evidentiary hearing on June 5 and 12, 1997. This decision reflects the findings made on the record at the conclusion of that hearing.

**3.** Katzenstein's invoices memorialize the nonexclusive license discussed, *supra*, in the accompanying text, and also contain printed conditions on the reverse side. One condition states that "[PEMI] may not assign or transfer the rights granted herein." The debtor argues that it never consented to and is not bound by these conditions; the invoices were sent after the work was done by Katzenstein. In light of the Court's disposition, it need not determine their effect.

**4.** The 1996 invoice also contains an anti-assignment provision on the reverse side. In this case, the debtor acknowledged its force by signing the invoice and expressly agreeing to the conditions on the reverse side.

The debtor had the option, however, to extend the expired license for unlimited usage. Under the invoice, the debtor could pay $20,000.00 at the end of the year, and thereby acquire unlimited worldwide use, in perpetuity. The debtor tendered the $20,000.00 to Katzenstein in open court in early June, 1997, but Katzenstein refused the tender.

After the debtor filed its chapter 11 case, it entered into an agreement with Glaxo Wellcome, Inc. ("Glaxo") to sell substantially all of its assets, and to assume and assign its executory contracts. The assets included the master tapes for the thirty four videotapes which incorporated Katzenstein's photographs.[5] Katzenstein objects to the proposed sale. First, he maintains that the debtor cannot assign its nonexclusive license to use his photographs without his consent under both federal copyright law and the anti-assignment provisions of the invoices. Second, he contends that the debtor cannot exercise the option, discussed above. Even if it could, the debtor could still not assign the extended, nonexclusive license, without his consent, for the same reasons it cannot sell the existing license.

## DISCUSSION

### A. Introduction

■ The copyright law, the spirit of which is embodied in section 106, grants a limited monopoly to the copyright owner to exploit his creation; "[i]t is intended to motivate the creative activity of authors and inventors by the provision of a special reward, and to allow the public access to the products of their genius after the limited period of exclusive control has expired." *Sony Corp. of America v. Universal City Studios, Inc.,* 464 U.S. 417, 429, 104 S.Ct. 774, 782, 78 L.Ed.2d 574 (1984); *accord Fogerty v. Fantasy, Inc.,* 510 U.S. 517, 526, 114 S.Ct. 1023, 1029, 127 L.Ed.2d 455 (1994). Only the copyright owner can transfer these rights. *Landau v. Cosmetic & Reconstructive Surgery Ctr., Inc.,* 158 F.R.D. 117, 119 (N.D.Ill.1994); *see* 17 U.S.C. § 106 ("the owner of [the] copyright ... has the exclusive rights to do *and*

*to authorize*" the designated uses of the copyrighted work)(emphasis added).

■ Ownership is the *sine qua non* of the right to transfer, and the copyright law distinguishes between exclusive and nonexclusive licenses. A "transfer of copyright ownership" includes the grant of an exclusive license, but not a nonexclusive license. 17 U.S.C. § 101. The holder of the exclusive license is entitled to all the rights and protections of the copyright owner to the extent of the license. 17 U.S.C. § 201(d)(2). *See generally* 3 Melvin B. Nimmer & David Nimmer, *Nimmer on Copyright* § 10.02[A], at 10–23 (1996) ("Nimmer"). Accordingly, the licensee under an exclusive license may freely transfer his rights, and moreover, the licensor cannot transfer the same rights to anyone else. *I.A.E., Inc. v. Shaver,* 74 F.3d 768, 775 (7th Cir.1996).

■ By contrast, the nonexclusive license does not transfer any rights of ownership; ownership remains in the licensor. *Id.; MacLean Assocs., Inc. v. William M. Mercer–Meidinger–Hansen, Inc.,* 952 F.2d 769, 778–79 (3d Cir.1991); *Effects Assocs., Inc. v. Cohen,* 908 F.2d 555, 558 (9th Cir.1990), *cert. denied,* 498 U.S. 1103, 111 S.Ct. 1003, 112 L.Ed.2d 1086 (1991); *Steege v. AT & T (In re Superior Toy & Mfg. Co.),* 183 B.R. 826, 833 (Bankr.N.D.Ill.1995); 3 Nimmer § 10.02[A], at 10–23. Thus, the nonexclusive licensee does not acquire a property interest in the licensed rights, *see In re CFLC, Inc.,* 89 F.3d 673, 679 (9th Cir.1996); Schuyler M. Moore, *Entertainment Bankruptcies: The Copyright Act Meets the Bankruptcy Code,* 48 Bus. Lawyer 567, 569 (1993) (*"Entertainment Bankruptcies"*), and unlike the exclusive licensee, lacks standing to sue for its infringement. *Swarovski America, Ltd. v. Silver Deer Ltd.,* 537 F.Supp. 1201, 1205 (D.Colo. 1982); 3 Nimmer § 12.02[B], at 12–54–55; *see* 17 U.S.C. § 501(a). Accordingly, the nonexclusive license is personal to the transferee, *In re CFLC, Inc.* 89 F.3d at 679, and the licensee cannot assign it to a third party without the consent of the copyright owner.

---

5. Prior to the petition date, the debtor had sold its inventory of existing videotapes, and its right to have done so is not questioned. Glaxo was not, therefore, buying existing inventory, but rather, the right and ability to reproduce and sell new videotapes.

*See SQL Solutions, Inc. v. Oracle Corp.*, No. C–91–1079, 1991 WL 626458, at *6 (N.D.Cal. Dec. 18, 1991).

## B. Assignability Under Bankruptcy Law

PEMI argues that bankruptcy changes this result. Citing to the bankruptcy goal of maximizing the estate and the provisions of 11 U.S.C. § 365(f),[6] which render anti-assignment clauses unenforceable, the debtor argues that the Court should not enforce the anti-assignment clause in Katzenstein's invoices. This argument, however, ignores the initial thrust of Katzenstein's position; federal copyright law precludes the assignment without regard to the anti-assignment provisions in the invoices.

■ Bankruptcy courts have generally treated nonexclusive copyright and patent licenses[7] as executory contracts, *see generally* Bradley N. Raderman & John Walshe Murray, *Assumption & Assignment of Patent Licenses under Chapter 11 of the Bankruptcy Code*, 6 J. Bankr.L. & Prac. 513, 514–15 (1997), and have considered their assignability under 11 U.S.C. § 365. *See, e.g., In re CFLC, Inc.* 89 F.3d at 677; *Lubrizol Enters., Inc. v. Richmond Metal Finishers, Inc. (In re Richmond Metal Finishers, Inc)*, 756 F.2d 1043, 1045–46 (4th Cir.1985), *cert. denied*, 475 U.S. 1057, 106 S.Ct. 1285, 89 L.Ed.2d 592 (1986) (superseded by 11 U.S.C. § 365(n) on other grounds); *see generally Entertainment Bankruptcies* at 584; *cf. Institut Pasteur v. Cambridge Biotech Corp.*, 104 F.3d 489, 490 n. 2 (1st Cir.1997) (noting the parties' agreement that the nonexclusive patent licenses at issue were executory contracts), *cert. de-*

*nied*, —— U.S. ——, 117 S.Ct. 2511, 138 L.Ed.2d 1014 (1997). The Court assumes, without deciding, that the Katzenstein license meets the threshold criteria for executoriness and that its assignment is otherwise in the best interest of the estate.

■ Under section 365(a), a trustee[8] may, subject to court approval, assume an executory contract. Similarly, under section 365(f), a trustee may, subject to court approval, assign an executory contract. The trustee ordinarily may take either of these actions notwithstanding that a provision in the contract purports to limit or restrict assignment. *See In re CFLC, Inc.*, 89 F.3d at 676.

■ "The trustee's power, however, is not absolute", *See id.* (citing *Metropolitan Airports Comm'n v. Northwest Airlines, Inc. (In re Midway Airlines, Inc.)*, 6 F.3d 492, 494 (7th Cir.1993)), and both section 365(a) and 365(f), which authorize assumption and assignment respectively, are expressly subject to an exception contained in 365(c):

(c) the trustee may not assume or assign an executory contract or unexpired lease of the debtor, whether or not such contract or lease prohibits or restricts assignment of rights or delegation of duties, if—

(1) (A) applicable law excuses a party, other than the debtor, to such contract or lease from accepting performance from or rendering performance to an entity other than the debtor or debtor in possession, whether or not such contract or lease prohibits or restricts assignment of rights or delegation of duties; and

**6.** Section 365(f) provides in pertinent part, as follows:

(1) Except as provided in subsection (c) of this section, notwithstanding a provision in an executory contract or unexpired lease of the debtor, or in applicable law, that prohibits, restricts, or conditions the assignment of such contract or lease, the trustee may assign such contract or lease under paragraph (2) of this subsection....

. . . .

(3) Notwithstanding a provision in an executory contract or unexpired lease of the debtor, or in applicable law that terminates or modifies, or permits a party other than the debtor to terminate or modify, such contract or lease or a right or obligation under such contract or lease on account of an assignment of such contract or

lease, such contract, lease, right, or obligation may not be terminated or modified under such provision because of the assumption or assignment of such contract or lease by the trustee.

**7.** The court may look to the patent law for guidance "because of the historic kinship between patent law and copyright law." *Sony Corp. of America v. Universal City Studios, Inc.*, 464 U.S. at 439, 104 S.Ct. at 787; *accord Harris v. Emus Records Corp.*, 734 F.2d 1329, 1333 (9th Cir. 1984); *SQL Solutions, Inc. v. Oracle Corp.*, 1991 WL 626458, at *6.

**8.** Under 11 U.S.C. § 1107(a), a debtor in possession, subject to certain exceptions not applicable here, has the same rights and duties of a trustee.

(B) such party does not consent to such assumption or assignment. . . .

 Section 365(c) is directed to contracts that, regardless of their provisions, would not be assignable under applicable nonbankruptcy law.[9] *See* Lawrence P. King et al., 3 *Collier on Bankruptcy* ¶ 365.06[1][a], at 365–56 (15th ed.1997); *see also In re Alltech Plastics, Inc.,* 71 B.R. 686, 688 (Bankr.W.D.Tenn.1987). Hence, the court must look to the "applicable law" and determine whether PEMI can assign the Katzenstein license. Ordinarily, a court will apply state contractual law to disputes concerning the scope of a copyright license. *See Bourne v. Walt Disney Co.,* 68 F.3d 621, 631 (2d Cir.1995), *cert. denied,* — U.S. —, 116 S.Ct. 1890, 135 L.Ed.2d 184 (1996). State contractual law will yield, however, to an overriding federal law or policy. *See Fantastic Fakes, Inc. v. Pickwick Int'l, Inc.,* 661 F.2d 479, 483 (5th Cir.1981); *SQL Solutions, Inc. v. Oracle Corp.,* 1991 WL 626458, at *3.

The federal policy designed to protect the limited monopoly of copyright owners and restrict unauthorized use constitutes applicable nonbankruptcy law. It prevents the trustee from assigning the nonexclusive license absent the owner's consent. *In re CFLC, Inc.,* 89 F.3d 673, decided under the patent law, and hence, analogous to copyright cases, is directly on point. In a 1986 agreement, the Cadtrak Corporation ("Cadtrak") granted CFLC, Inc., a personal computer company, a nonexclusive patent license to use certain computer graphics technology. The license agreement stated, among other things, that it was non-transferable and was governed by California law. *Id.* at 674–75.

After filing for chapter 11 relief in 1993, CFLC sought to sell its remaining assets to Everex Systems, Inc. ("Everex") for $4 million. The sale agreement required the debtor's assumption and assignment of the Cadtrak license, but Cadtrak objected. The bankruptcy court denied the motion as to the Cadtrak license, and the district court affirmed. *See In re CFLC, Inc.,* 174 B.R. 119 (N.D.Cal.1994). In its decision, the district court noted that the debtor argued (as PEMI does here) that "bankruptcy policy requires maximization of the debtor's assets and that the result reached here by the bankruptcy court undermines that policy." *Id.* at 123. While acknowledging that this represents the policy advanced by 11 U.S.C. § 365(f), the district court stated that the argument ignores the effect of section 365(c). That subsection "recognizes that there are other policies in law as well, and the statute expressly subordinates the policy of maximization to those other policies." *Id.* at 123–24.

Everex then appealed to the 9th Circuit. Agreeing that the license was an executory contract for purposes of 11 U.S.C. § 365, *In re CFLC, Inc.* 89 F.3d at 677, the Court of Appeals turned its attention to the issue of non-assignability under applicable law raised by section 365(c). Noting that the fundamental policy of the federal patent system is to encourage the creation and disclosure of new advances in technology, the court stated that federal law should govern the assignability of nonexclusive patent licenses:

> Allowing free assignability—or, more accurately, allowing states to allow free assignability—of nonexclusive patent licenses would undermine the reward that encourages invention because a party seeking to use the patented invention could either seek a license from the patent holder or seek an assignment of an existing patent license from a licensee. In essence, every licensee would become a potential competitor with the licensor-patent holder in the market for licenses under the patents. . . . Thus, any license a patent holder granted . . . would be fraught with the danger that the licensee would assign it to the patent holder's most serious competitor, a party whom the patent holder itself might be absolutely unwilling to License.

*Id.* at 679. Reiterating the well-settled rule that "a non-exclusive licensee of a patent has only a personal and not a property interest in

---

9. Even if the debtor's application were considered a sale under section 363, the Court must still look to "applicable law" to determine if the debtor can sell the Katzenstein license. While subsection 363(1) invalidates *ipso facto* clauses, other restrictions, not based on the debtor's financial condition, remain effective with respect to the trustee's sale of property. *See* Lawrence P. King, *et al., 3 Collier on Bankruptcy* ¶ 363.10[1], at 363–54–55 (15th ed.1997).

the patent and that this personal right cannot be assigned unless the patent owner authorizes the assignment or the license itself permits assignment," *id.* (quoting *Gilson v. Republic of Ireland,* 787 F.2d 655, 658 (D.C.Cir.1986)), the court concluded:

> Because federal law governs the assignability of nonexclusive patent licenses, and because federal law makes such licenses personal and assignable only with the consent of the licensor, the Cadtrak license is not assumable and assignable in bankruptcy under 11 U.S.C. 365(c).

*Id.* at 680.

This conclusion applies with equal force in the analogous area of copyright law. Although the assignment of the Katzenstein license will maximize the assets available to creditors, this goal must give way to the countervailing considerations expressed in section 365(c). Accordingly, the Court holds that PEMI cannot assign its nonexclusive Katzenstein license to Glaxo without Katzenstein's consent. Further, it would be an inappropriate exercise of business judgment to pay Katzenstein $20,000.00 to exercise the option since, even if the debtor could do so, it would only obtain another non-assignable, nonexclusive license. In light of this disposition, it is not necessary to address the arguments regarding the effect of the anti-assignment provisions contained in the invoices.

SETTLE ORDER ON NOTICE