In re GOLDEN BOOKS FAMILY EN-TERTAINMENT, INC., Golden Books Publishing Company, Inc., Golden Books Home Video, Inc., LRM Acquisition Corp., Shari Lewis Enterprises, Inc., and SLE Productions, Inc., Debtors.

Nos. 01–1920 through 01–1925 (RRM.)

United States Bankruptcy Court,
D. Delaware.

Nov. 8, 2001.

Edmon L. Morton, Young Conaway Stargatt & Taylor, LLP, Wilmington, Delaware, Matthew Feldman, Wilkie Farr & Gallagher, New York City, for debtors.

David B. Stratton, Pepper Hamilton, LLP, Wilmington, Delaware, D. Ross Martin, Ropes & Gray, Boston, MA, for DIC Entertainment, L.P.

Rachel B. Mersky, Walsh Monzack, Monaco, Wilmington, Delaware, Leslie A. Cohen, Liner, Yankelevitz, Sunshine & Regenstreif, Santa Monica, California, for Classic Media, Random House.

## MEMORANDUM OPINION

McKELVIE, District Judge.

This is a bankruptcy case. Golden Books Family Entertainment, Inc. is a debtor before this court. Golden Books publishes, produces, licenses, and markets a host of children's and family-related media and entertainment products. It owns an array of film copyrights, distribution rights, trademarks, and licenses relating to characters, television programs, and motion pictures. Moreover, through a number of license agreements, Golden Books publishes children's books featuring characters owned by other companies.

Golden Books, as part of its sale of its assets to Random House and Classic Media, Inc. ("the Buyers"), is proposing to assume and assign various executory contracts. Among the contracts that Golden Books is seeking to assume and assign is an Agreement, dated April 20, 1998, with DIC Entertainment, L.P., in which Golden Books licenses certain of DIC's copyright and trademark rights with respect to the children's character, Madeline (the "Madeline Agreement").

This court approved Golden Books' proposed asset sale to the Buyers in a sale

order dated August 15, 2001. Golden Books and the Buyers formally consummated the sale transaction at a closing on August 28, 2001. On or before the August 15, 2001, sale hearing, several parties filed objections contesting the assumption and assignment of certain executory contracts pursuant to the terms of the Buyers purchase agreement. The court was not asked to rule on the merits of those objections at the sale hearing and the these rights were preserved for later argument and ruling. Paragraph 12 of the sale order for the sale to the Buyers provides that:

> all parties [who have failed to object are] deemed to have given the consent contemplated by the Bankruptcy Code Sections 365(c)(1) and (f)(1) to the assumption of such Executory Contract by the relevant Debtors and the assignment of such Executory Contract to the [Buyers].

After being notified of the sale, DIC filed a motion with the court on August 13, 2001, objecting to the transfer of the rights to Madeline from Golden Books to the Buyers under § 365(c) of the bankruptcy code, which prohibits a bankruptcy trustee from assuming and assigning executory contracts where applicable non-bankruptcy law operates to prohibit such transfers. In its objection brief, DIC argues that the Madeline Agreement is an executory contract within the meaning of § 365(c) of the Bankruptcy Code, that the Madeline Agreement is a nonexclusive personal license, and that copyright law prohibits the transfer of nonexclusive personal licenses without the permission of the licensor. At an oral argument before the court on September 28, 2001, DIC set forth an alternative argument that even if the court disagrees with DIC's characterization of the Madeline Agreement as a nonexclusive license and finds that the Madeline Agreement is an exclusive license, copyright law

also prohibits the free transfer of exclusive licenses. DIC found support for this proposition of law in the recent Central District of California case, *Gardner v. Nike, Inc.,* 110 F.Supp.2d. 1282 (C.D.Cal.2000).

The objection motion has been fully briefed and argued by both parties. This is the court's decision on DIC's motion.

## I. *DISCUSSION*

Under § 365(c) of the Bankruptcy Code, when an executory contract can not be assigned under applicable non-bankruptcy law, it may not be assumed or assigned by the bankruptcy trustee without permission of the other contracting party. Lawrence P. King *et al.,* 3 Collier on Bankruptcy ¶ 365.06[1] (15th ed.1997). The relevant portion of section 365(c) states:

> Trustees may not assume or assign any executory contract . . . of the debtor, whether or not such contract . . . prohibits or restricts assignment of rights if,
> . . .
>
> 1)
>
>> A) applicable law excuses a party, other than the debtor, to such contract from accepting performance from or rendering performance to an entity other than the debtor or debtor in possession . . . . whether or not such contract . . . prohibits or restricts assignment of rights or delegation of duties; and
>>
>> B) such party does not consent to such assumption or assignment.

11 U.S.C. § 365(c). In this case, Golden Books is operating as the trustee because it is a debtor in possession pursuant to 11 U.S.C. § 1107(a).

The issue before the court is whether Golden Books, as debtor in possession, can freely assign the Madeline Agreement to the Buyers without the permission of DIC.

To resolve this issue, the court must first determine whether a copyright license is an "executory contract" within the meaning of 11 U.S.C. § 365(c). If it is, the court must then determine whether under the "applicable law" of copyright, the license is one that is not freely transferable. 11 U.S.C. § 365(c)(1)(A).

The parties do not dispute that the Madeline Agreement is an "executory contract" within the meaning of section 365(c). Courts, including the Third Circuit, have widely held that the test to be applied to determine whether a contract is executory is the "Countryman" definition, which provides that a contract is executory when the obligations of "both the bankrupt and the other party to the contract are so far unperformed that the failure of either to complete performance would constitute a material breach excusing the performance of the other." Countryman, Executory Contracts in Bankruptcy; Part I, 57 Minn. L.Rev. 439, 460 (1973); see also Everex Systems. Inc. v. Cadtrak Corp (In re CFLC, Inc.), 89 F.3d 673, 677 (9th Cir. 1996) (an executory contract is "a contract . . . on which performance is due to some extent on both sides"); Sharon Steel Corp. v. Nat'l Fuel Gas Distrib. Corp., 872 F.2d 36, 39 (3d Cir.1989). Applying the Countryman definition of executory contracts, courts generally have found intellectual property licenses to be "executory" within the meaning of section 365(c) because each party to the license had the material duty of "refraining from suing the other for infringement of any of the [intellectual property] covered by the license." In re Access Beyond Tech., Inc., 237 B.R. 32 (Bankr.D.Del.1999); see generally, Bradley N. Raderman and John Walshe Murray, Assumption and Assignment of Patent Licenses under Chapter 11 of the Bankruptcy Code, 6 J.Bankr.L. & Prac. 513, 514–15 (1997).

■ The issue thus becomes a question of copyright law: Does copyright law preclude the free assignment of the Madeline Agreement? Courts have generally found that the answer to this question turns on whether the license is exclusive or nonexclusive. See generally In re Patient Educ. Media, Inc., 210 B.R. 237 (Bankr.S.D.N.Y. 1997); Perlman v. Catapult Entm't, Inc. (In re Catapult Entm't, Inc.), 165 F.3d 747 (9th Cir.1999); see also Aleta A. Mills, Note: The Impact of Bankruptcy on Patent and Copyright Licenses, 17 Bankr. Dev.J. 575, 585–86 (2001) (collecting and summarizing cases). Under copyright law, "a nonexclusive licensee . . . has only a personal and not a property interest in the [intellectual property]," which "cannot be assigned unless the [intellectual property] owner authorizes the assignment. . . ." In re Patient Educ. Media, 210 B.R. at 242–43 (citing references omitted); see also 3 Melvin B. Nimmer & David Nimmer, Nimmer on Copyright § 10.02[A] at 10–23 (1996) (hereinafter "Nimmer"). By contrast, however, an exclusive licensee does acquire property rights and "may freely transfer his rights, and moreover, the licensor cannot transfer the same rights to anyone else." In re Patient Educ. Media, 210 B.R. at 240; see also 3 Nimmer § 10.02[A] at 10–23; but see Gardner, 110 F.Supp.2d at 1287 (analyzing the Copyright Act and holding that licensees cannot freely transfer rights even under exclusive license).

■ To determine whether the Madeline Agreement is an exclusive or nonexclusive license, the court must examine the terms of the agreement itself.

### A. The Madeline Agreement

In the Madeline Agreement, DIC granted to Golden Books certain rights in Madeline cartoons that were owned by DIC. Section 2(a) of the Agreement, which sets

forth the parties "Basic Rights," states that, with respect to 25 specified currently existing half-hour animated programs based on the [Madeline Property],

> DIC hereby grants to Golden, throughout the Territory, the sole, exclusive, and irrevocable right, license, and privilege to (i) manufacture, sell, rent, and otherwise distribute "Videograms" of the Programs in any and all formats and configurations; (ii) publicize, advertise, exploit, promote, market and turn to account copies of such Videograms ("Copies") in connection with any or all of the foregoing rights, and (iii) license, lease, and authorize others to do any or all of foregoing during the Term.

As set forth in section 3, the "Term" of the license agreement runs from April 20, 1998 until June 1, 2004. The "Territory" is defined, in section 4 of the Agreement, as including the United States and its territories and Canada. "Videograms" is defined in section 2(a) as "a cassette, disc, or other device now known or hereafter devised and designed to be used in conjunction with a reproduction apparatus which causes a visual image . . . to be seen on the screen of a television receiver or any comparable device. . . ."

At oral argument, Golden Books and the Buyers pointed to a number of relevant provisions of the Agreement that they believe demonstrate that the Madeline Agreement is an exclusive and not a non-exclusive license. Specifically, Buyers counsel directed the court to:

> section 2(a), set forth above;
>
> section 2(c), which states that "Golden Books shall have the sole, full, and complete discretion concerning the manufacture, distribution, marketing, and other exploitation of all Videograms and Copies" and that the judgment of Golden Books as to all matters affecting exploitation shall be binding on DIC;

> section 2(d), which states that Golden Books shall have the sole and exclusive right to negotiate and enter into contracts with respect to the property, "including the right to sublicense its rights hereunder";
>
> section 2(e), which states that "Golden Books shall have the right to use and authorize others to use the name, physical likeness . . . biographies, and voice of any person rendering services in connection with the Programs";
>
> section 9, which obligates DIC to provide further assurances in the event that there is a question as to the grant that has been given to Golden Books in the agreement; and,
>
> section 12(d), which states that none of the rights granted to Golden Books in the Agreement has been or will be transferred by DIC to any third party.

Each of these rights seems to indicate that Golden Books did hold exclusive rights with respect to the licensed property.

In apparent contradiction to section 2(a), which gives Golden Books the exclusive right to sub-license the Madeline Properties to others, the Agreement also includes among its miscellaneous provisions a section labeled Assignments/Sublicense (section 18(e)), which states that subject to certain exceptions: "Neither party shall have the right to assign its rights and obligations hereunder without the other party's prior consent, which consent shall not be unreasonably withheld."

### B. *Is the Madeline Agreement Exclusive or Nonexclusive?*

It is clear from the above listed terms that the Madeline Agreement grants to Golden Books certain exclusive rights with respect to a sub-set of the copyright relating to the Madeline video properties that DIC owns. Golden Books and the Buyers

argue that the Madeline Agreement is an exclusive license simply because it grants to Golden Books certain exclusive rights. They also argue that limitations in the license as to territory and term do not undercut the exclusivity of the license, because rights conferred under exclusive licenses can and often do encompass less than the whole right to the property. DIC argues, however, that because the exclusive rights only cover a sub-set of the rights that DIC owns (e.g., they are in a limited territory and for a limited time), the license must be a nonexclusive license.

DIC's position that the license is necessarily nonexclusive because it only grants exclusive rights to a set of rights that are limited in temporal and geographical scope is incorrect as a matter of law. Intellectual property rights are recognized as bundles of rights, portions of which may be exclusively or nonexclusively licensed. The fact that only certain rights are exclusively licensed does not convert the license to a nonexclusive license. Under copyright law, even if one licenses a right that is limited in geographic or temporal scope, if that right is nonetheless exclusive within those parameters, it is an exclusive grant of a copyright. Therefore, based on the licenses terms, the court finds that the Madeline Agreement is an exclusive license.

■ DIC's only plausible textual argument in support of nonexclusivity is that section 18(e) detracts from the exclusivity of the license in the sense that Golden Books cannot have a freely transferable property interest if they need DIC's permission to sub-license it. Given the many provisions in the Agreement that indicate that this license was indeed meant to be exclusive, the court declines to accept this argument.

Copyright law clearly distinguishes between the legal effect of a nonexclusive license and an exclusive license. Contract clauses restricting assignment do not change this calculus under the copyright law. The court therefore finds that the non-assignment clause of section 18(e) is exactly the type of boilerplate restriction of assignment that section 365(f) states should have no bearing on this matter. *See* 11 U.S.C. § 365(f)(1) ("Except as provided in subsection (c) of this section, *notwithstanding a provision in an executory contract . . . that prohibits, restricts, or conditions the assignment of such a contract . . .* the trustee may assign such contract . . .") (emphasis added); *see also* 11 U.S.C. § 365(c) ("Trustees may not assume or assign any executory contract . . . of the debtor, whether or not such contract . . . prohibits or restricts assignment of rights if . . ." excused by applicable law).

Accordingly, the court finds that the Madeline Agreement is an exclusive license.

### C. *Under Copyright Law, Does Golden Books Need DIC's Consent to Transfer the Madeline Agreement?*

DIC's objection as filed asserts that the Madeline Agreement is a nonexclusive license and is therefore non-assignable under the copyright law. Prevailing case law holds that nonexclusive intellectual property licenses do not give rise to ownership rights and are not assignable over the objection of the licensor. *See In re Catapult Entertainment*, 165 F.3d at 750 (holding nonexclusive licenses do not give rise to ownership rights and are not assignable over the objection of the licensor); *In re Patient Educ. Media*, 210 B.R. at 240 (same); *In re Access Beyond Tech.*, 237 B.R. at 44 (finding that patent license agreement at issue was nonexclusive because it did not convey the exclusive right or some part of the exclusive right to practice the invention and did not grant any right to exclude others from practicing the patents and holding that nonexclusive

license is not assignable). Having now found that the Madeline Agreement is an exclusive license, the court must now determine whether copyright law allows an exclusive licensee to freely transfer such a license.

At oral argument, DIC alternatively contended that if the court determined that the Madeline Agreement was an exclusive license that, as a matter of copyright law, even an exclusive license cannot be assigned without the licensor's consent. To support this argument, DIC relies on *Gardner v. Nike*, 110 F.Supp.2d. 1282 (C.D.Cal.2000).

In *Gardner*, Nike and Sony entered into an exclusive licensing agreement for the use of a cartoon character created by Nike. Sony subsequently transferred its rights under the license to Gardner, who started using the character on various products. In response to threatened legal action from Nike, Gardner brought an action for declaratory relief against Nike seeking a declaration of his right to use the character. Gardner argued that under the Copyright Act, Sony, the original licensee, was allowed to transfer its rights to him without the consent of the original licensor, because the exclusive license made the original licensee an "owner" under the Copyright Act. As an "owner," Gardner asserted, the original licensee was able to transfer whatever rights it had (including the right to assign, as set forth in § 106 of the Copyright Act[1]) under

§ 201(d) of the Copyright Act.[2] *Gardner*, 110 F.Supp.2d. at 1284. In opposition, Nike argued that, according to the text of § 201(d), the original licensee was not an "owner" who has all the rights of ownership (including the right to assign); rather, § 201(d) only conferred upon the original licensee the "protections and remedies" of a copyright owner, which the court held includes only the right to sue and defend suits in its own name, but not the right to assign. *Id.* The *Gardner* court agreed with Nike and held that exclusive licensees do not have the right to assign under § 201(d) of the Copyright Act. *Id.* at 1286.

Commentators have noted that the holding in Gardner flatly contradicts the leading treatise on copyright law, Nimmer on Copyright, and leading bankruptcy cases such as *In re Patient Educ. Media* that state that under the Copyright Act exclusive licenses are freely assignable. *See, e.g.,* Ronald Leibow, Ashleigh Danker & Keith Murphy, Transfer of Intellectual Property Rights in Bankruptcy, 820 PLI/Comm 1141, 1154–1163 (2001).

*In re Patient Education Media* is a bankruptcy case. The issue presented in *Patient Education Media* was whether the debtor could transfer its nonexclusive license to use the copyrighted work over the objection of the copyright owner. Although the court did not need to address exclusive licenses in its holding, in dicta the court referred to the distinction in the

---

1. Section 106 of the Copyright Act provides in relevant part that "the owner of [the] copyright ... has the exclusive rights to do and to authorize" the designated uses of the copyrighted work. 17 U.S.C. § 106.

2. Section 201(d) of the Copyright Act provides as follows:
 (d) Transfer of Ownership.
 The ownership of a copyright may be transferred in whole or in part by any means of conveyance or by operation of law ...

Any of the exclusive rights comprised in a copyright, including any subdivision of any of the rights specified by section 106, may be transferred as provided by the clause (1) and owned separately. The owner of any particular exclusive right is entitled, to the extent of that right, to all of the protection and remedies afforded to the copyright owner by this title. 17 U.S.C. § 201(d).

**318**

copyright law between nonexclusive and exclusive licenses, and concluded that, in contrast to nonexclusive licenses, exclusive licenses are freely assignable. The court reasoned that:

> Ownership is the sine qua non of the right to transfer, and the copyright law distinguishes between exclusive and non-exclusive licenses. A "transfer of copyright ownership" includes the grant of an exclusive license, but not a nonexclusive license. 17 U.S.C. § 101. The holder of the exclusive license is entitled to all of the rights and protections of the copyright owner to the extent of the license. 17 U.S.C. § 201(d). *See generally* 3 [Nimmer] § 10.02[A] at 10–23 (1996)[ ]. Accordingly, the licensee under an exclusive license may freely transfer his rights, and moreover, the licensor cannot transfer the same rights to anyone else.

*In re Patient Educ. Media*, 210 B.R. at 240. The proposition that exclusive licenses are freely assignable by the licensee is echoed in the Nimmer on Copyright treatise (which is cited in the above quote from *Patient Education Media*) and in other bankruptcy treatises that address this issue. *See, e.g.*, Primoff and Weinberger, E–Commerce and Dot–Com Bankruptcies: Assumption, Assignment, and Rejection of Executory Contracts, Including Intellectual Property Agreements, and Related Issues Under Sections 365(c), 365(e), and 365(n) of the Bankruptcy Code, 8 American Bankruptcy Institute Law Review 307, 326 (2000) ("Pursuant to section 201(d)(2) of the Copyright Act, the holder of an exclusive copyright is entitled, to the extend of such right, to all of the rights and remedies accorded to a copyright owner. Such rights include the exclusive right to transfer. A licensee under an exclusive copyright license would, therefore, have the right to transfer its exclusive right to do and to authorize the designated uses of the copyright. Based on the foregoing, an e-commerce debtor-licensee's exclusive license is not implicated by section 365(c) of the Bankruptcy Code").

This court finds the reasoning of *Gardner* to be unpersuasive. The Copyright Act clearly states that there is a key distinction between exclusive and nonexclusive licenses. Section 101 of the Copyright Act defines a "Transfer of Copyright Ownership" as the:

> assignment, mortgage, *exclusive license,* or any other conveyance, alienation, or hypothecation of a copyright or any of the exclusive rights comprised in a copyright, whether or not it is limited in time or place of effect, but not including a nonexclusive license.

17 U.S.C. § 101 (emphasis added). The court in *Gardner* held that conferring "protections and remedies" on an exclusive licensee is distinct from conferring ownership rights. In so doing, the *Gardner* court effectively interpreted § 201(d) to limit the meaning of "ownership" as set forth in § 101. According to the *Gardner* court's construction of the phrase "protections and remedies" in § 201(d), granting exclusive licensees "protections" does not necessarily grant them the right to assign. Rather, it only confers on the licensee the right to sue for infringement and to defend suits in its own name. This right is set forth for copyright owners in § 501(b). It is difficult to understand why the *Gardner* court held that the phrase "protections and remedies" confers on exclusive licensees the particular rights of copyright owners that are set forth in § 501(b), but does not confer to exclusive licensees the rights of copyright owners, such as the right to freely assign, that are set forth in § 106.

The more natural reading of § 201(d) is that Congress intended exclusive licensees to have all of the rights of an owner to the extent the license is intended to cover each of these rights. The court therefore declines to adopt the holding of

the *Gardner* court and instead finds, in accordance with *Patient Educ. Media* and Nimmer, that exclusive licensees have the right to freely assign their rights.

## II. CONCLUSION

The court finds that Madeline Agreement is an exclusive license. The court also finds that, under applicable copyright law, exclusive licenses convey an ownership interest to the licensee that allows that licensee to freely transfer its rights. Therefore, in this case, copyright law does not prevent the assumption and assignment of the Madeline Agreement. The court thus has authority to permit the Golden Books to assume and assign the Madeline Agreement as part of their sale to Random House and Classic Media, Inc. Accordingly, DIC's objection will be denied.

The court will enter an order in accordance with this memorandum opinion.