**In re GOLDEN BOOKS FAMILY ENTERTAINMENT, INC., Golden Books Publishing Company, Inc., Golden Books Home Video, Inc., LRM Acquisition Corp., Shari Lewis Enterprises, Inc., and SLE Productions, Inc., Debtors.**

**Nos. 01–1920 through 01–1925 (RRM).**

United States Bankruptcy Court, D. Delaware.

Nov. 8, 2001.

Edmon L. Morton, Young Conaway Stargatt & Taylor, LLP, Wilmington, Delaware, Jennifer Harding, Wilkie Farr & Gallagher, New York City, for debtors.

Kevin Mangan, Walsh Monzack, Monaco, Wilmington, Delaware, Bruce Nathan, Ralph Berman, Davidoff & Malito, New York City, for Random House.

Jeffrey C. Wisler, Michelle McMahon, Connolly Bove Lodge & Hutz, LLP, Wilmington, Delaware, Jon L.R. Dalberg, Andrews & Kurth, Los Angeles, California, for Warner Bros. Consumer Products.

## MEMORANDUM OPINION

McKELVIE, District Judge.

This is a bankruptcy case. Golden Books Family Entertainment, Inc. is a debtor before this court. Golden Books publishes, produces, licenses, and markets a host of children's and family-related media and entertainment products. It owns an array of film copyrights, distribution rights, trademarks, and licenses relating to characters, television programs, and motion pictures. Moreover, through a number of license agreements, Golden Books publishes children's books featuring characters owned by other companies.

Golden Books, as part of the sale of its assets to Random House and Classic Media, Inc. ("the Buyers"), is proposing to assume and assign various executory contracts. Among the contracts that Golden Books is seeking to assume and assign are various publishing license agreements in which Warner Bros. Consumer Products ("WBCP"), a division of Time Warner Entertainment, L.P., licenses to Golden Books a sub-set of WBCP's copyright and trademark rights with respect to certain animated children's characters.

There are seven agreements at issue. Three of the agreements pertain respectively to the animated character "Frosty the Snowman," a set of animated characters designated as "Cartoon Network

Originals," and another set of animated characters designated as "Cartoon Network Classics—Hanna Barbera." Two agreements relate to the cartoon character "Scooby Doo." The remaining two agreements relate to a set of cartoon characters from the animated television show, the "Power Puff Girls."

## I. *FACTUAL AND PROCEDURAL BACKGROUND*

Pursuant to an order from this court, dated June 28, 2001 entitled "Bid Procedures Order," Golden Books held an auction to sell its assets to the highest and best bidder. The auction was held on July 27, 2001 at the offices of Wilkie Farr & Gallagher in New York. After determining that the Buyers submitted the highest and best bid for the assets, Golden Books entered into an asset purchase agreement with the Buyers. On August 15, 2001, the date that was designated as the sale hearing date by the court's August 1, 2001 order, this court conducted a sale hearing and signed a sale order approving the asset purchase agreement between Golden Books and the Buyers. Those parties formally consummated the sale transaction at a closing on August 28, 2001.

On August 6, 2001, after the auction but before the court approved the asset purchase agreement, Golden Books sent a Notice of Hearing to Consider Objections to Debtors' Motion to Sell All or Substantially All of the Debtors Assets Free and Clear of All Liens, Claims, Encumbrances, and Other Interests to a number of interested parties, such as licensors of Golden Books, who might have objections to portions of the sale. WBCP was among the parties to which notices were sent.

In response to the notice, several parties filed objections prior to the August 15, 2001 sale hearing contesting the assumption and assignment of certain executory contracts pursuant to the terms of the asset purchase agreement. Paragraph 12 of the sale order for the sale to the Buyers provides that:

> all parties [who have failed to object are] deemed to have given the consent contemplated by the Bankruptcy Code Sections 365(c)(1) and (f)(1) to the assumption of such Executory Contract by the relevant Debtors and the assignment of such Executory Contract to the [Buyers].

The deadline for filing such objections was August 13, 2001.

WBCP did not file an objection prior to the August 15, 2001 hearing. On August 17, 2001, WBCP filed its Objection To Debtor's Notice of Intent To Assume and Assign Executory Contracts, arguing that certain of the notices were defective because they were either addressed to a general studio lot address at Warner Bros. Inc., instead of being addressed to the specified address that each of its license agreements require notice to be sent to: Warner Bros. Consumer Products, a Division of Time Warner Entertainment Company, L.P., 4000 Warner Blvd., Burbank, CA 91522. Despite the fact that each of the license agreements was executed by Gary Simon, a Senior Vice President of Warner Bros. Consumer Products, none of the notices were addressed to a particular individual within Warner Bros. Consumer Products. Certain of the notices that were addressed to the proper address, were addressed to the attention of the "Asst. Controller." These notices, however, incorrectly included references to license numbers that did not correspond to any WBCP licenses. Consequently, WBCP asserts that its general counsel, Wayne M. Smith, did not receive actual notice of the debtors' intent to assume and assign to the Buyers the specific license agreements at issue until August 14, 2001.

WBCP argues that the notices were additionally deficient because the schedule of

license agreements to be assumed and assigned failed to designate each of the specific license agreements referred to by its specific license number, which is assigned by WBCP and printed in the upper right hand corner of the face of each of the agreements. WBCP supplemented this objection on August 18, 2001, explaining that it had learned that fourteen of the notices were incorrectly sent to another address specified in the license agreements, the check-processing center in Chicago, Illinois to which the payments and royalty statements must be sent according to each of the agreements. In the ordinary course, these notices were forwarded by the processing center to WBCP in Burbank, California, but did not arrive at the legal department until August 14, 2001.

In its August 17 objection motion, WBCP also objected to the assumption and assignment of the seven WBCP licenses and requested that, in light of the defective notice, the court consider its objection to be timely filed.

Also on August 17, 2001, WBCP filed a conditional objection, which again it asked the court to consider as timely filed. The conditional objection states that if the court overrules its objection with respect to the assumption and assignment of the license agreements, then the court must order the cure payment of $89,000 that it alleges is due and owing under four of the license agreements.

On August 20, 2001, WBCP amended its objection to the assumption and assignment of the seven licenses. In its amended objection, WBCP argued that three of the seven licenses were non-executed draft agreements and that the other four agreements were not assignable because they contained non-assignment clauses. On September 4, 2001, WBCP filed its Supplemental Memorandum of Points and Authorities in Support of its Filed Objections to Debtors' Notice of Intent to Assume and Assign Executory Contracts. In its memorandum, WBCP supplements its earlier arguments regarding the defectiveness of the notice and goes on to substantively argue that the agreements at issue are either non-assignable drafts or nonexclusive personal licenses, and that, under § 365(c) of the Bankruptcy Code, copyright law prohibits the transfer of nonexclusive personal licenses without the permission of the licensor. The September 4 memorandum is the first objection that properly characterizes WBCP's objection as one under § 365(c) of the Bankruptcy Code.

On September 12, 2001, WBCP withdrew its earlier filed objection to the assumption and assignment of one of the seven agreements, the Frosty License Agreement, a Merchandise and Promotional License Letter Agreement, dated April 1, 2001, by and between WBCP as licensor and Golden Books as licensee, pertaining to the character "Frosty the Snowman." WBCP maintains its objection regarding the assumption and assignment of the six remaining agreements.

On October 5, 2001, Random House filed its response to WBCP's objections to the debtor's assumption of the WBCP contracts and the subsequent assignment to Random House, Inc. In its brief, Random House argues that the WBCP objections are untimely and without substantive merit.

The court heard oral argument on WBCP's objections at an omnibus hearing for Golden Books bankruptcy matters on October 10, 2001. This is the court's decision on WBCP's objections.

## II. *DISCUSSION*

### A. *Should the Court Entertain WBCP's Late-filed Objections?*

As stated above, WBCP contends that the court should consider the merits of its

untimely filed objection to the assumption and assignment of certain license agreements, because the notice that was meant to inform them of the deadline for filing objections was defective.

Golden Books and one of the Buyers, Random House, argue in response that there is no equitable reason for the court to allow WBCP to withdraw its implied consent to the assignment and assumption of the license agreements at issue, which, they argue, occurred by virtue of its own failure to register any timely objection with the court.

Rule 6006 of the Federal Rules of Bankruptcy Procedure governs the assumption, rejection, or assignment of executory contracts. Rule 6006(c) requires notice of a proceeding to assume, reject, or assign an executory contract to be given to the other party to that executory contract. Rule 6006(a) provides that a proceeding to assume, reject, or assign an executory contract, other than as part of a plan, is a contested matter, governed by Rule 9014. Rule 9014, in turn, states that motions in contested matters must be served in the same manner provided for service of a summons and complaint in Rule 7004. Rule 7004(b)(3) provides for service by mail:

> Upon a domestic or foreign corporation or upon a partnership or other unincorporated association, by mailing a copy of the [notice] to the attention of an officer, a managing or general agent, or to any other agent authorized by appointment or by law to receive service of process. . . .

Although bankruptcy courts have differed when addressing the issue of how strictly to interpret this provision, certain courts have found that these notice requirements are to be strictly adhered to. *See, e.g., In re Schoon,* 153 B.R. 48 (Bankr. N.D.Cal.1993) (holding that by addressing an envelope Attn: President, the debtors did not serve an officer, they served an office, and finding that such service was invalid and "makes a joke of the requirement that an officer be served"); *but see In re C.V.H. Transp., Inc.,* 254 B.R. 331, 333 (Bankr.M.D.Pa.2000) (rejecting the strict interpretation of Rule 7004(b)(3) set forth in *Schoon* ). Indeed, the Supreme Court has stated that strict fulfillment of notice requirements are central to our system of jurisprudence: "due process of law in any proceeding which is to be accorded finality [requires] notice reasonably calculated, under all circumstances, to apprise interested parties of the pendency of the action and to afford them an opportunity to present their objections." *Mullane v. Central Hanover Bank & Trust Co.,* 339 U.S. 306, 314, 70 S.Ct. 652, 94 L.Ed. 865 (1950).

■ The court agrees with WBCP that the August 6, 2001 notice documents were deficient because, among other things, they failed to address any of the copies of the notice to a person of authority or to a person authorized to accept service. The person at Warner who is responsible for these contracts, Gary Simon, was well-known, or at least easily identifiable, to Golden Books, because he was the WBCP signatory on each of the signed contracts. In this case, it does not seem too onerous to require the notice to comply with the literal requirement that it be addressed to an officer or to the known person responsible for such licensing matters, in order for the notice to be considered "reasonably calculated" to afford WBCP an opportunity to object in this particular circumstance, especially given the extremely short period in which those receiving notice were given to file objections. Parties receiving the notice, which was dated August 6, 2001, were required to respond with objections by August 13, 2001; that is six business

days. This short time period causes the impact of the asserted deficiencies in the notice to be more severe. Given that WBCP's general counsel did not receive actual notice until August 14, 2001, the court will consider the late-filed objections as timely filed.

At the oral argument, counsel for Random House argued that even if such notice were found to be insufficient, the court should nonetheless refuse to entertain WBCP's objections either because (1) Random House should have already been on notice prior to August 6, 2001 due to its being on notice about the bid procedures, or (2) Random House's filings after the closing date of the sale were in bad faith and unduly prejudice the Buyers. The court will consider these equitable arguments in turn.

■ Random House first argues that prior to August 6, when notice of the assumption and assignment and of the August 15, 2001 sale hearing was sent out, WBCP had received on July 2, 2001 an earlier notice dated June 29, 2001 that its contracts were subject to assumption and assignment to the winning bidder of Golden Books's assets. At that point in time, the then-contemplated purchaser was another company, DIC GB Acquisition Corp. Golden Books ultimately sold the assets to the Buyers, Random House and Classic Media, Inc., who entered the bidding process after DIC and submitted the highest and best offer for the Golden Books assets at the July 27, 2001 auction. Random House argues that this earlier notice was sufficient to put WBCP on notice that its contracts would be assumed and assigned to Random House and Classic Media, and that to the extent WBCP had any objection to the assumption and assignment of its contracts, WBCP was required to file its objection at that time.

The court finds the argument that WBCP had adequate notice of these events by virtue of its notice of the prior sale procedures to be unpersuasive. WBCP has stated that while it did not object to its licenses being assigned to the original purchaser, DIC, it does object for valid business reasons to the assignment of these licenses to Random House. Random House and WBCP are competitors in the publishing industry, and Random House has a relationship with one of WBCP's largest competitors, Disney. Therefore, notice of an earlier sale to which it would not object cannot be said to put WBCP on notice of the sale to Random House and Classic Media, Inc. This was the purpose of the August 6, 2001 notice.

■ Random House next notes that the WBCP's memorandum filed on September 4, 2001 to supplement its earlier objection was filed one week after the August 28, 2001 closing date of the sale of the Golden Books assets in which Random House and Classic Media, Inc. purchased assets from Golden Books that included these very contracts. Random House argues that although letters from WBCP's counsel demonstrate that WBCP knew the closing was happening, WBCP took no action to seek relief from the court to stop the sale. It concludes that WBCP's failure to act should preclude it from filing a post-sale objection. Random House contends that WBCP's September 4, 2001 request for relief is too late because it would unduly prejudice the Buyers now that the sale has gone through and the Buyers have paid a purchase price that includes the benefit of these contracts. Random House also contends that the earlier objections, standing alone, do not state any valid objection.

After reviewing the August 23, 2001, letter from WBCP's counsel to Golden Book's counsel, the court finds that WBCP's memorandum supplementing its

objection, which was filed post-closing, was not filed in bad faith and was not filed after it waived its right to object. The letter states:

> In the course of our discussion, you indicated to me that the Debtor intends to close the Sale tomorrow, Friday, August 24, 2001, but that it is the Debtor's position that, pursuant to Paragraph 16 of the Order of the Bankruptcy Court approving the Sale, because the WBCP Objections have been filed and not withdrawn, the WBCP Agreements will not be affected by that closing. This letter will confirm that, based on this representation, WBCP will not file its motion with the Bankruptcy Court seeking a stay of the Order and tomorrow's proposed closing as to the WBCP Agreements. WBCP does, however, reserve its rights in all other respects, including (without limitation) its right to file such additional or supplemental pleadings in connection with the WBCP Objections as WBCP may deem appropriate.

Letter from Jon L.R. Dalberg, Esq., Andrews & Kurth L.L.P., to Jennifer Harding, Esq., Wilkie Farr & Gallagher (Aug. 23, 2001).

Random House argues that it was unaware of this letter and that the agreement reflected within was inconsistent with Golden Books' communicated position to Random House that the WBCP contracts were assigned to Random House at the closing. Random House also argues that WBCP should have taken action with the court instead of by private letter. The court finds that, based on the substance of the letter, action of the court would have been unnecessary at that time because WBCP believed that its objections would be preserved. Because WBCP believed that its objections were preserved under paragraph 16 of the Sale Order, in which the court reserved for decision all filed

objections to the assumption and assignment of executory contracts, it, in good faith, did not seek to interfere with the consummation of the larger sale transaction. Although at this point the sale has already been consummated, Golden Books and the Buyers both knew of WBCP's objections to these six contracts before closing the deal. While the debtor and the Buyers argue that considering WBCP's objections at this point would prejudice them, the court finds that they have not proven the severe degree of prejudice necessary to convince this court that it must ignore WBCP's objections as a matter of equity.

It appears to the court that WBCP has acted in good faith throughout this process. Upon receiving the notice, WBCP acted quickly to file its objection with the court and later more fully fleshed out the substance of that objection through supplemental briefing. Although the sale has now been completed, the debtor and Buyers had sufficient notice of WBCP's objection before the closing date such that they cannot now claim that there is undue prejudice against them. Moreover, it should be noted that if the court were to consider and grant WBCP's objections, this would not undo the entire sale transaction. It would mean that, to the extent Golden Books sold assets that it did not own as a matter of law, the portions of the sale transaction relating to those assets would need to be adjusted.

The court therefore elects to treat WBCP's objections as timely filed and will address the merits of those objections. *See* Bankruptcy Rule 9006(b)(1) (court may for cause enlarge the time within which an act is required to be done, before or after the expiration of the time, based on "excusable neglect"); *Chemetron Corp. v. Jones,* 72 F.3d 341, 349 (3d Cir.1995) (discussing factors for equitable doctrine of

"excusable neglect," which include the danger of prejudice to the debtor, the length of the delay, the reason for the delay, and whether the moving party acted in good faith); *Pioneer Inv. Servs. Co. v. Brunswick Assocs. Ltd. P'ship,* 507 U.S. 380, 113 S.Ct. 1489, 123 L.Ed.2d 74 (1993). The objections, taken together, state that WBCP believes that Golden Books cannot transfer the agreements at issue without its consent.

### B. Should the Court Sustain WBCP's Objections?

### 1. Does § 365(c) prevent Golden Books from assuming and assigning the Scooby Doo and Power Puff Girl licenses with the consent of WBCP?

Under § 365(c) of the Bankruptcy Code, when an executory contract can not be assigned under applicable non-bankruptcy law, it may not be assumed or assigned by the bankruptcy trustee without permission of the other contracting party. Lawrence P. King *et al.,* 3 Collier on Bankruptcy ¶ 365.06[1] (15th ed.1997). The relevant portion of § 365(c) states:

> Trustees may not assume or assign any executory contract ... of the debtor, whether or not such contract ... prohibits or restricts assignment of rights if,
> ...
> 1)
>
> > A) applicable law .excuses a party, other than the debtor, to such contract from accepting performance from or rendering performance to an entity other than the debtor or debtor in possession .... whether or not such contract ... prohibits or restricts assignment of rights or delegation of duties; and
> >
> > B) such party does not consent to such assumption or assignment.

11 U.S.C. § 365(c). In this case, Golden Books is operating as the trustee because it is a debtor in possession pursuant to 11 U.S.C. § 1107(a).

The issue before the court is whether Golden Books, as debtor in possession, can freely assign the license agreements at issue to the Buyers without the permission of WBCP. To resolve this issue, the court must first determine whether the copyright licenses are "executory contracts" within the meaning of 11 U.S.C. § 365(c). If they are, the court must then determine whether under the "applicable law" of copyright, the licenses are not freely transferable. 11 U.S.C. § 365(c)(1)(A).

Golden Books and the Buyers first argue that the six license agreements at issue are not "executory contracts" within the meaning of section 365(c). The Third Circuit test to be applied to determine whether a contract is executory is the "Countryman" test, which provides that a contract is executory when the obligations of "both the bankrupt and the other party to the contract are so far unperformed that the failure of either to complete performance would constitute a material breach excusing the performance of the other." Countryman, Executory Contracts in Bankruptcy; Part I, 57 Minn.L.Rev. 439, 460 (1973); *In re Columbia Gas Sys.,* 50 F.3d 233, 239 (3d Cir.1995) (citing *Sharon Steel Corp. v. Nat'l Fuel Gas Distrib. Corp.,* 872 F.2d 36, 38–39 (3d Cir.1989)). Applying the Countryman definition of executory contracts, courts generally have found intellectual property licenses to be "executory" within the meaning of section 365(c) because each party to the license had the material duty of "refraining from suing the other for infringement of any of the [intellectual property] covered by the license." *In re Access Beyond Tech., Inc.,* 237 B.R. 32 (Bankr.D.Del.1999); *see gen-*

*erally,* Bradley N. Raderman and John Walshe Murray, Assumption and Assignment of Patent Licenses under Chapter 11 of the Bankruptcy Code, 6 J.Bankr.L. & Prac. 513, 514–15 (1997). The court thus finds that the WBCP's licenses are executory contracts within the meaning of § 365(c).

The issue under § 365(c) thus becomes a question of copyright law: Does copyright law preclude the free assignment of the licenses at issue? Courts have generally found that the answer to this question turns on whether each particular license is exclusive or nonexclusive. *See generally In re Patient Educ. Media, Inc.,* 210 B.R. 237 (Bankr.S.D.N.Y.1997); *See Perlman v. Catapult Entm't Inc. (In re Catapult Entm't, Inc.),* 165 F.3d 747 (9th Cir.1999); *see also* Aleta A. Mills, Note: The Impact of Bankruptcy on Patent and Copyright Licenses, 17 Bankr.Dev.J. 575, 585–86 (2001) (collecting and summarizing cases).

■ Under copyright law, "a nonexclusive licensee … has only a personal and not a property interest in the [intellectual property]," which "cannot be assigned unless the [intellectual property] owner authorizes the assignment. . . ." *In re Patient Educ. Media,* 210 B.R. at 242–43 (citing references omitted); *see also* 3 Melvin B. Nimmer & David Nimmer, Nimmer on Copyright § 10.02[A] at 10–23 (1996) (hereinafter "Nimmer"). By contrast, however, an exclusive licensee does acquire property rights and "may freely transfer his rights, and moreover, the licensor cannot transfer the same rights to anyone else." *In re Patient Educ. Media,* 210 B.R. at 240; *see also* 3 Nimmer § 10.02[A] at 10–23; *but see Gardner v. Nike, Inc.,* 110 F.Supp.2d 1282, 1287 (C.D.Cal.2000) (analyzing the Copyright Act and holding that licensees cannot freely transfer rights even under exclusive license).

■ To determine whether the agreements are exclusive or nonexclusive licenses, the court must examine the terms of the agreements. Two of the agreements at issue, the March 6, 2000 publishing license relating to Scooby–Doo and the March 6, 2000 publishing license relating to the Power Puff Girls contain the following language in Section 3(b), which is labeled "Reservation of Rights; Premiums:"

> Notwithstanding anything to the contrary stated herein, Licensor, for itself and its affiliates, specifically reserves the right, without limitation throughout the world, to use, or license any third party(s) of its or their choice to use the Licensed Property. . . . Further, Licensor reserves the right to use, or license others to use, and/or manufacture products similar or identical to those licensed herein for use as premiums.

Moreover, both agreements include the following language in Section 19 of the Agreements' Standard Terms and Conditions:

> This Agreement is personal to the Licensee. Licensee shall not sublicense, franchise, or delegate to third parties its rights hereunder (except as set forth in Paragraph 10(b) hereof).

Last, Section 20 of both agreements expressly states, that the parties

> acknowledge and agree that in a bankruptcy context this Agreement is a license of the type described by Section 365(c)(1) of the Bankruptcy Code and may not be assigned without prior written consent of the Licensor.

In light of all of this language, it is clear that these two licenses do not confer exclusive rights to Golden Books. Both licenses are therefore nonexclusive.

The other two publishing license agreements have an effective date of July 12, 2001 and also respectively relate to Scoo-

by–Doo and the Power Puff Girls. These two license agreements contain even clearer language than March 6, 2000 agreements, which indicates that they are nonexclusive license agreements. The two licenses, contain identical "Grant of Rights" sections which state that "[s]ubject to these Standard Terms and Conditions, Licensor [WBCP] grants Publisher [Golden Books] the non-exclusive right during the Term and in the Territory to utilize the Property and the Licensed Materials...." No other language within these two licenses indicates that they are exclusive licenses or that, as Random House argues, the quoted language above means that the licenses are limited in duration and geographic scope, but are nonetheless exclusive with respect to those limited rights.

Accordingly, the court finds that the four license agreements relating to Scooby–Doo and the Power Puff Girls are nonexclusive licenses and are therefore nonassignable under the copyright law. It is evident from the language of these four licenses that WBCP meant to exercise a considerable degree control over these licenses as a matter of business policy. As stated above, prevailing case law holds that nonexclusive intellectual property licenses do not give rise to ownership rights and cannot, as a matter of law, be assigned without the consent of the licensor. *See In re Catapult Entertainment,* 165 F.3d at 750 (holding nonexclusive licenses do not give rise to ownership rights and are not assignable over the objection of the licensor); *In re Patient Educ. Media,* 210 B.R. at 240 (same); *In re Access Beyond Tech.,* 237 B.R. at 44 (finding that patent license agreement at issue was nonexclusive because it did not convey the exclusive right or some part of the exclusive right to practice the invention and did not grant any right to exclude others from practicing the patents and holding that nonexclusive license is not assignable).

2. *Can Golden Books assume and assign the two Cartoon Network licenses?*

■ WBCP next contends that the two agreements pertaining to the "Cartoon Network Originals" and "Cartoon Network Classics—Hanna Barbera" are unexecuted drafts that do not constitute contracts at all and that, therefore, Golden Books has no rights to assume and assign them. Golden Books' own listing of these two contracts on page S–21 of the contract assignment schedule that was appended as an exhibit to the Notice and entitled "Section 2.1(e) Licenses" describes the two Cartoon Networks licenses as "drafts."

WBCP argues that, as a matter of law, only executory contracts that are in existence as of the time of the commencement of the bankruptcy may be assumed or assigned, because if no contract exists, there is nothing to assume or assign. *See* Lawrence P. King *et al.,* 3 Collier on Bankruptcy ¶ 365.02[2] (15th ed.1997) (contract terminated pre-petition cannot be assumed or assigned because "there is nothing left . . . to assume or assign"). In response, Golden Books and the Buyers claim that both parties were operating under these two agreements and that, at minimum, they were oral contracts that were being honored by Warner and not merely drafts.

It is clear that even according to WBCP, the parties were operating under both of these contracts. WBCP, in its conditional objection seeking cure amounts, claims that "according to WBCP's internal accounting records, the following Guaranteed Payments are past due and owing:" (1) for the "96724 TOON license" covering "Various Cartoon Network," Golden Books owes WBCP $10,000; (2) for the "12546

CNHBD license" covering "Various Cartoon Network—Hanna Barbera," Golden Books owes WBCP is $50,000. Thus, these agreements were not drafts, but binding oral agreements that are demonstrated by the parties' course of conduct.

 The only question that remains for the court to resolve is whether such oral agreements can confer exclusive rights to a licensee that are freely transferable under copyright law. This question has already been answered by other courts and by the Copyright Act itself. According to the Copyright Act, 17 U.S.C. § 204(a), while a nonexclusive license may be oral, an exclusive license "is not valid unless an instrument of conveyance, or a note or memorandum of the transfer, is in writing and signed by the owner of the rights conveyed. . . ." *Eden Toys, Inc. v. Florelee Undergarment Co., Inc.,* 697 F.2d 27, 36 (2d Cir.1982); 17 U.S.C. § 204(a) ("A transfer of copyright ownership, other than by operation of law, is not valid unless an instrument of conveyance, or a note or memorandum of the transfer, is in writing and signed by the owner of the rights conveyed or such owner's duly authorized agent"). The purpose of the provision is to protect copyright holders from persons mistakenly or fraudulently claiming oral licenses. *See Eden Toys, Inc.,* 697 F.2d at 36. Because the court concludes that such oral licenses must, as a matter of law, be nonexclusive, the court finds that Golden Books may not assume and assign these two licenses without the permission of WBCP. *See supra,* § II.B.1.

III. *CONCLUSION*

The court finds that the four licenses relating to Scooby–Doo and the Power Puff Girls are nonexclusive licenses. The court also finds that the two licenses relating to Cartoon Network are nonexclusive licenses. Because under applicable copyright law, nonexclusive licenses are personal and do not convey an ownership interest to the licensee that allows that licensee to freely transfer its rights, the court finds that copyright law prevents the free assumption and assignment of these agreements.

Accordingly, WBCP' objection will be upheld. The court will enter an order in accordance with this memorandum opinion.