**In the matter of The TRAVELOT COMPANY, Debtor.**

**No. 02–40020.**

United States Bankruptcy Court, S.D. Georgia, Savannah Division.

June 14, 2002.

C. James McCallar, Jr., Savannah, GA, for Debtor.

Kathleen Horne, Savannah, GA, for Defendant/Respondent.

### MEMORANDUM AND ORDER ON AS-SUMABILITY OF EXECUTORY CONTRACT AND MOTION TO DIS-MISS FOR FAILURE TO FILE IN GOOD FAITH

LAMAR W. DAVIS, Jr., Bankruptcy Judge.

The Travelot Company ("Travelot") filed its Chapter 11 case on January 2, 2002, approximately 30 minutes before Respondent Turner Broadcasting Sales, Inc., agent for Cable News Network ("CNN"), sent a termination notice advising Travelot that its contractual rights under a certain agreement between the parties was terminated effective that date. On February 8, 2002, Travelot, as the Debtor–in–Possession ("the DIP"), filed an Emergency Motion to Assume Executory Contract and Cure Default. CNN filed a response asserting that because of the subject matter of the parties' agreement, the Contract, while executory, is, as a matter of law, not subject to assumption. The DIP then modified its motion, seeking the Court's determination that the Contract was assumable in accordance with 11 U.S.C. § 365(c), while recognizing that if the Contract is assumable, the DIP must file a motion seeking authority to assume and must satisfy the other provisions of § 365 concerning cure and assurance of future performance. The matter was tried before the Court on February 27 and 28, 2002.

This Court has jurisdiction pursuant to 28 U.S.C. § 157(a) and (b)(1) over this core proceeding. Pursuant to Federal Rule of Bankruptcy Procedure 7052(a), I make the

following Findings of Fact and Conclusions of Law.

## FINDINGS OF FACT

Travelot is a closely held corporation which envisioned and developed a plan for providing enhanced web-based travel bookings which it believes would offer consumers a level of service substantially better than that currently offered by on-line booking agencies. Current internet-based available choices for booking of reservations for airlines, hotels, car rental agencies, and the like, provide instant information about availability and cost on the worldwideweb. In the event that a consumer does not have pre-existing knowledge of the area to which s/he intends to travel, Travelot realized that the consumer currently cannot find qualitative information about travel accommodations or destination-specific information about tours, local attractions, and the like. This information has traditionally been obtained through a travel agent located in the consumer's hometown, whose ability to assist has been hampered in many cases by the lack of detailed, up-to-date, first-hand knowledge of the caliber of the facilities for which the consumers are searching.

### The Travelot Business Concept

The concept developed by Travelot involves coupling the benefits of on-line bookings with the customized services of a pre-screened, high quality travel agent in the destination locality so that a given traveler could obtain not only availability and cost information but also qualitative comments about various facilities and attractions. Through continuing e-mail contacts, that traveler would then be able to develop a customized travel itinerary. Travelot conceived of a business model whereby it would link to a pre-existing high traffic website for attracting customers, advertise the availability of its services through broadcast and internet advertising, and obtain its revenue through commissions paid to Travelot by travel agents in the destination localities who arrange the bookings. The agents would, in turn, derive their commissions from the providers of hotel, auto and other requested services. Travelot would pre-approve and register travel agents to participate and provide the linkage between the pre-existing high traffic website and Travelot's network of travel agents, through the services of a technology partner.

### The Negotiations and Agreement with CNN

Travelot presented its concept to officials at CNN, who expressed interest in pursuing a business arrangement whereby CNN would provide Travelot's proposed travel service on the CNN.com travel webpage. Subsequently, Travelot and the appropriate CNN officials engaged in a lengthy period of contract negotiations.

Travelot and CNN agreed that key to the success of the proposed venture was Travelot's obtaining a cooperative agreement with a technology partner who could provide the technical expertise in order to connect the CNN.com visitor with the provider and ultimately with the local travel agent. Within the industry, such technology services can be provided by only a few organizations known as "global distribution systems" ("GDS"). One GDS which operates in the travel arena is World Span. CNN was familiar with World Span and its reputation and approved in concept the notion of Travelot becoming a contracting party with CNN with the understanding that World Span would be the technology partner. World Span in fact was a named party to the agreement in one of the preliminary drafts, but ultimately, for reasons expressed by World Span, its name was removed as the named technology provid-

er. Even so, the parties expected World Span to be the GDS to be utilized by Travelot.

As the result of lengthy negotiations, a contract for launching phase one of a two-phased plan was dated September 25, 2001, and transmitted on that date to Travelot's representative, Robert Isaacson. Travelot executed the agreement and returned it to CNN for execution. On or after October 1, 2001, the contract was signed by Larry Goodman, President of Turner Broadcasting Sales, Inc.

The Contract is comprised of three parts: (1) a letter signed by the presidents of Travelot and CNN, Travelot's Ex. B, at 1–2; (2) a "Term Sheet," *id.* at 3–13; and (3) a "Terms and Conditions" statement, *id.* at 34–41. The Contract includes terms addressing ownership and use of Travelot's and CNN's intellectual property, providing for implementation of the two phases anticipated in the venture, setting up certain controls and conditions for giving CNN testing and approval rights over the content of Travelot's "Travel Content" to be placed on the CNN website, and establishing a payment schedule.

The Contract requires Travelot to purchase $6 million in advertising from CNN over a three-year period. Travelot would be provided with 3.8 billion "impressions," which are "popup" ads that appear on the CNN website when a user is online. Travelot values these impressions at $33 million in annual advertising value.

The Contract required Travelot to make a $750,000.00 payment to CNN in three installments prior to implementation of the first phase, *see* Term Sheet ¶ 8.1, followed by $5.25 million in cash over three years, *id.* ¶ 8.2, in return for which CNN assured Travelot that it would receive advertising worth $6 million. The first installment was a payment of $250,000.00 due within thirty days after the agreement was exe-

cuted. Additional payments of $250,000.00 each were due on or before December 15, 2001, and on or before January 15, 2002. The three payments were described in the Contract as "partial consideration for CNN's integration of the travel content on the CNN sites and the attendant services offered on the CNN sites," Term Sheet ¶ 8.1. Apparently, for legal and other reasons known only to CNN, it could not or did not wish to book revenues attributable to pre-paid advertising, but it did wish to begin a revenue stream flowing. Accordingly, the $750,000 payment was designated as a "licensing fee." *See* CNN's Ex. 17 (Aaron Dalin's June 11, 2001, email to Isaacson).

CNN's ultimate obligation to afford Travelot access to its website was dependent upon CNN's approval of Travelot's demonstration that the on-line travel booking contemplated in phase one would function in a manner that met the quality standards which CNN expected. The targeted start-up date was approximately 60 days after the execution of the Contract, subject to CNN's final approval of the content and functionality of the Travelot product.

*The Potential Breach Issues*

In the Contract, CNN reserved the right to pre-approve all of Travelot's "Travel Content" prior to it being inserted on the CNN site and was obligated to provide Travelot a media plan by November 1, 2001, together with approval of the Travelot's proposal as to the mock up, or sample, web pages that illustrated how the Travel Content would appear on the CNN site, *see* Term Sheet ¶ 8.2. Travelot agreed that its Travel Content would have certain CNN navigation and branding and an overall look and feel reasonably agreeable to both parties. Term Sheet ¶ 3.1. Travelot projected that its revenue from phase one would total approximately $2 million per year and would be achieved at

insignificant or no cost because the GDS would bear most of the operating costs.

CNN failed to provide a detailed media plan to Travelot by November 1, 2001. CNN also failed to provide approval or feedback with respect to the mockups which Travelot sent to CNN for approval. TBS's Vice–President for Business Development testified that CNN did not provide a specific media plan on or before November 1 because Travelot did not appear to be pressuring CNN to meet that deadline and because there were at that time other more pressing matters facing the parties.

One of the more pressing matters involved final approval of a GDS. The Contract as executed did not limit Travelot's selection of a technology partner. Prior to its execution of the Contract, Travelot, in conformity with its obligation to ensure that the on-line booking system would operate satisfactorily to the consumer, determined, in its continuing due diligence work with World Span, that the "functionality" of the World Span product as technology partner was not "robust enough," in the words of Robert Isaacson, to serve the needs of Travelot and CNN. Isaacson communicated to CNN officials his concerns about whether CNN would ultimately approve what World Span had to offer and suggested that Travelot might look for an alternative provider of GDS services. CNN agreed that it was appropriate for Travelot to look for alternative out-sourcing of this portion of the Contract.

Subsequently, Travelot entered into discussions with Amadeus, another GDS provider. Amadeus, which was apparently interested in signing on as a technology provider under the Contract, was brought into discussions with CNN. Ultimately, Amadeus suggested that in order to make a commitment to the parties, it would require alterations of the Contract. Those proposed alterations were unacceptable to

CNN. Isaacson and CNN continued a dialogue about the manner in which a technology partner could be found, and that discussion was ongoing at the time Travelot's first and second $250,000.00 payments became due. As a result, Travelot did not make the payments. CNN ultimately declared the Contract in default and sent notice of termination on December 18, 2001, Travelot's Ex. 7. After the notice had been mailed but before the "cure period" expired, the third $250,000.00 payment became due. Shortly before the cure period expired, Travelot filed for Chapter 11 protection.

Travelot acknowledges that its sole purpose in filing was to preserve its contract rights with CNN by invoking protection of the § 362 automatic stay. As a result of Travelot's failure to make the license fee payments, CNN had to restructure its travel editorial staff. Further, the loss of revenue has forced CNN to redirect funds internally in order to keep the essential website functions up and running.

CNN's witnesses presented unsurprising and uncontradicted testimony that "CNN" is a mark recognized worldwide, and that CNN zealously and aggressively works to ensure that its mark is not appropriated unlawfully by non-licensed users or damaged or denigrated in any way by licensed users of its product. Farah Carter, in-house counsel to Turner Broadcasting Sales, Inc., testified that the CNN brand or endorsement applies to all content contained on CNN's page which is not clearly an advertisement and that allowing Travelot to place content on the CNN pages amounts to an endorsement by CNN.

David Payne, a senior vice president, testified that prior to the execution of the Contract, he was skeptical of Travelot's ability to perform, but that he received assurances that World Span to provide the

technical support contemplated by the proposal. When he later learned that World Span was not in the picture, he foresaw immediate and irreparable harm to CNN. Because the customer remains at all times within the "CNN template/brand-name" in doing the on-line booking, and since the link on the CNN webpage is not to a Travelot.com webpage, he believed that Travelot was, in effect, seeking what amounts to a CNN endorsement of the travel content which Travelot would place on the CNN webpage. As a result, he believed that CNN will suffer if the on-line booking functionality does not work in a manner satisfactory to the consumer. He admitted that many of his concerns are the same now as they were prior to the execution of the Contract; yet he gave final approval to his company's execution of the Contract.

Ms. Carter testified that CNN would not have entered into this contract without the participation of World Span; yet she admits that CNN agreed to remove World Span as a named party to the Contract. Carter concedes that CNN had the right to review all content and pre-approve it as being in conformity with CNN guidelines. CNN also had the right to control the content of any advertisements placed on its webpage, although the standards for advertising and non-advertising content differ and are managed by different departments within CNN.

*The Debtor in Possession*

Travelot filed its bankruptcy case on the fifteenth day after CNN placed Travelot on notice of default. At that time, Travelot had only $60.00 in its bank account and acknowledged a debt to CNN of $750,000.00. Mr. Isaacson, Travelot's principal, testified that he had access to $1 million in venture capital which could be raised within a reasonable time, but that he had no cash immediately available to invest in the company. Isaacson is Travelot's only full time employee, and he currently is not paid a salary.

Travelot has invested substantial cash and sweat equity into this project. Uncontradicted evidence shows that Travelot, through private venture capital, raised and expended more than one-half million dollars in bringing the project along to its current point. Travelot's concept of on-line travel booking plus contact with high quality destination travel agents is, Travelot believes, unique in the travel industry. The responsive capability and independent recommendations from a destination agent are, it believes, a far more attractive and higher quality product than is currently offered by any entity. Because of the high cost of infrastructure, Travelot cannot implement its system without the active participation of a GDS which can provide electronic access to reservation computers of airlines, hotels, and automobile and other providers worldwide.

CNN urges the Court to dismiss Travelot's case, and asserts three bases for dismissal: (1) § 365(c) prohibits the DIP from assuming the Contract because Travelot is a licensee of trademarks from CNN; (2) cause for dismissal exists under § 1112(b) because Travelot filed in bad faith; and (3) Travelot defaulted under the Contract and the DIP cannot cure all defaults as required by § 365(b).

## CONCLUSIONS OF LAW

**A. 11 U.S.C. § 365(c): Assumability of the Contract**

Pursuant to the findings and conclusions that follow, I conclude that the Contract is assumable by Travelot as Debtor in Possession.

*1. The Contract is an executory contract within the ambit of § 365(c) which may be assumed unless applicable law*

*excuses its assumption.*[1]

■ Generally, pursuant to authority granted in the Bankruptcy Code, which provides that a trustee "may assume or reject any executory contract ... of the debtor," 11 U.S.C. § 365(a), a debtor in possession may, subject to the court's approval, "assume any executory contract from itself as debtor." *City of Jamestown v. James Cable Partners, L.P. (In re James Cable Partners, L.P.)*, 27 F.3d 534, 537 (11th Cir.1994) (noting that debtors in possession generally have rights, powers, and duties of trustees). This general rule, however, is subject to certain restrictions and exclusions:

> (c) The trustee may not assume or assign any executory contract ... of the debtor, whether or not such contract ... prohibits or restricts assignment of rights or delegation of duties, if—
>
> (1)(A) applicable law excuses a party, other than the debtor, to such contract ... from accepting performance from or rendering performance to an entity other than the debtor or the debtor in possession, whether or not such contract ... prohibits or restricts assignment of rights or delegation of duties; and
>
> (B) such party does not consent to such assumption or assignment ....

§ 365(c)(1). Here, the agreement between CNN and Travelot ("the Contract") is an executory contract, in that virtually all of each party's obligations under the Contract are as yet unperformed.

■ The plain terms of § 365(c) bar a debtor in possession from assuming an executory contract if applicable law would bar assignment to a hypothetical third party. *See James Cable*, 27 F.3d at 537 (applying hypothetical-question test in affirm-ing lower court, which reached same result applying actual test); *accord, Perlman v. Catapult Entm't, Inc. (In re Catapult Entm't, Inc.)*, 165 F.3d 747, 749–50 (9th Cir.1999) (discussing "actual" and "hypothetical" tests in applying § 365(c) and concluding: "[W]e are bound by the plain terms of the statute and join the Third and Eleventh Circuits in adopting the 'hypothetical test.' "). Here, the question is whether applicable law excuses CNN, which has not consented to assumption of the Contract, from accepting performance from or rendering performance to an entity other than Travelot or the DIP, without regard to whether such an assignment is in fact contemplated.

*2. Trademark law is "applicable law" under § 365(c).*

■ "Applicable law" sufficient under § 365(c) to excuse a party to a contract from "accepting performance from or rendering performance to an entity other than the debtor or the debtor in possession" includes intellectual property law governing the assignment of licenses. *See, e.g., Catapult Entm't*, 165 F.3d at 750 (addressing patent license); *In re Golden Books Family Entm't, Inc.*, 269 B.R. 300, 308–10 (Bankr.D.Del.2001) (addressing copyright license). Federal trademark law governs CNN's rights in its "CNN" trade and service marks. *See* Travelot's Ex. F.; Lan-ham Trade–Mark Act, 15 U.S.C. § 1127 (including within scope of protected "marks": trademarks (defined as any reg-istered "word, name, symbol, or device or any combination thereof" used in com-merce "to identify and distinguish his or her goods ... from those ... sold by others and to indicate the source of the goods") and service marks (defined as any

---

1. Although at the outset the question was raised whether Travelot's rights were gov-erned by § 108 or § 365, the parties ultimate-ly recognized, and the Court agrees, that § 365 controls.

registered "word, name, symbol, or device, or any combination thereof" intended to be used in commerce "to identify and distinguish the services of one person ... from the services of others and to indicate the source of the services")). A trademark registrant may successfully sue an infringer upon a showing that the infringer, without authorization from the registrant, used the mark in commerce and that the unauthorized use caused or was likely to cause confusion or deception. *Davidoff & Cie, S.A. v. PLD Int'l Corp.,* 263 F.3d 1297, 1300–01 (11th Cir.2001) (construing Lanham Trade–Mark Act). With authorization, however, a would-be infringer may use another's registered trademark in commerce.

A trademark license provides such authorization, in that it is a grant of permission to use the grantor's mark. *Bunn–O–Matic Corp. v. Bunn Coffee Serv.,* 88 F.Supp.2d 914, 920–21 (C.D.Ill.2000); *Goldberg v. Cuzcatlan Beverages, Inc.* (*In re Impact Distribs., Inc.*) 260 B.R. 48, 54 (Bankr.S.D.Fla.2001); *cf. also De Forest Radio Tel. & Tel. Co. v. United States,* 273 U.S. 236, 242, 47 S.Ct. 366, 368, 71 L.Ed. 625 (1927) ("[A] license ... has been described as a mere waiver of the right to sue by the [owner of a patent].").

*3. For trademark law to preclude assumability of the Travelot–CNN Contract, the Contract must be construed as containing a non-exclusive trademark license.*

■■■■ The grant of a non-exclusive license is "an assignment in gross," that is, one personal to the assignee and thus not freely assignable to a third party. *E.g., Tap Publ'ns, Inc. v. Chinese Yellow Pages (New York), Inc.,* 925 F.Supp. 212, 218 (S.D.N.Y.1996); *In re Golden Books,* 269 B.R. at 310 (addressing patent license). Accordingly, a licensor need not accept performance from or render performance to an entity other than the licensee.

■■■ CNN, as a federal trademark registrant, is entitled to nationwide trademark protection. *See* 15 U.S.C. § 1072. That protection includes application of law which precludes unauthorized assignment of CNN's trademark license. *See* discussion *supra.* If the Contract provided for Travelot to be the recipient of a trademark license, then applicable trademark law precludes assignment of that trademark. The issue is whether the Contract provided such a license to Travelot.

CNN has asserted, and it appears well settled, that for Travelot to be the recipient of a license to use CNN's trademark, there must have been (1) a grant of CNN's permission to use its mark and (2) retention of quality control by CNN over Travelot's use of the mark in the Contract. *See Bunn–O–Matic,* 88 F.Supp.2d at 920–21 (stating that grant of permission to use grantor's trademark, retention of ownership, and grantor's obligating itself to maintain quality standards are "the essential terms of a trademark license"). CNN clearly retained control over its marks. Therefore, the remaining issue is whether the Contract effectively granted the license.

*4. The contract provisions neither expressly nor impliedly granted Travelot a trademark license in CNN's marks.*

For a trademark license to exist in the first place, there must be evidence that the trademark owner intended to grant a license in its trademark. In this case, the question is whether such a grant is contained within a detailed written agreement executed by the parties after lengthy discussions and negotiations. I conclude that the provisions in the Contract to which CNN points, which are discussed below, fall woefully short of expressly granting a trademark license to Travelot.

One provision cited by CNN, styled "Company Logo,"[2] recites in its entirety:

Company [Travelot] hereby grants CNN a limited non-exclusive license to use the Company logo and any other Company marks, logotypes, or brand identifiers as Company may provide to CNN from time to time (collectively, the "Company Logo") during the Term of this Agreement. Such license is granted solely in connection with CNN's rights and obligations under this Agreement and, in particular, for the purpose of permitting CNN to display the Company Logo in the travel sections of the CNN Sites and on any other pages of the CNN Sites or any affiliated websites from which the Travel Content may be accessed. CNN will also be allowed to use and reproduce the Company Logo for the promotion of the CNN Sites, the Travel Section and the Travel Content, although to the extent such promotions involve media placements outside of the CNN Sites, then CNN will only be allowed to make such uses and reproductions as Company may approve in writing in advance of such promotion or promotions. Company represents and warrants that it has all rights to its respective Logo and the CNN's use thereof (as expressly authorized hereunder and as provided by Company) will not infringe the rights of any third party. Company agrees that it will not in any way suggest or imply by the written authorized use of CNN Site's marks, logotypes or brand identifiers (collectively, the 'CNN Logo') that Company's website or any of its products or services are affiliated with, endorsed or sponsored by or created in association with CNN except to the extent of the limited relationship established under this Agreement. Each party acknowledges that the other party owns all right, title and interest in and to its marks, logos or brand identifiers (each, a "Logo") and retains all rights with respect hereto. Neither party will do anything inconsistent with such ownership and all uses of a Logo will inure to the benefit of an [sic] on behalf of the respective owner of the Logo. Each party further agrees that it will not attack or assist other in attacking the title of the Logo of the other party.

Term Sheet ¶ 3.3.

Although this paragraph grants CNN, in explicit detail, a non-exclusive license in Travelot's marks, it does not grant Travelot a license in CNN's marks. Rather, Travelot simply agrees not to suggest or imply that its "authorized use" of CNN's marks extends beyond the "the extent of the limited relationship established under this Agreement." The paragraph thus alludes to, but does not "establish," any "authorized use" of CNN's marks. At most, it gives rise to an implication that other terms in the Contract may authorize certain uses of CNN's marks and establish the terms of the "limited relationship" between the parties, thus not foreclosing the possibility that another Contract provision grants a trademark license to Travelot.

A second provision cited by CNN, entitled "Branding," provides in its entirety:

CNN agrees to provide "Powered by Travelot" graphical branding for hotel, flight, car and "Quick Search" booking engine functionality and for the "Destination Advisor" and "Activities Advisor" service offerings as set forth in the mock-ups attached as *Schedule 1*. The mock-ups of the size and placement of such branding are also set forth in *Schedule 1*.

Term Sheet ¶ 4.2. This paragraph clearly does not contain a grant of a trademark

---

2. "Company" refers to Travelot.

license to Travelot. CNN's agreement to provide "Powered by Travelot" branding on the CNN website was simply an agreement to use the Travelot name on the CNN website.

CNN also points to a provision entitled "Incorporation Within CNN Website," which provides in its entirety: "CNN retains the right to use thumbnails, summaries, descriptions, and other ways of promoting and integrating Company Travel Content within other areas of CNN," Term Sheet ¶ 4.4. Here again, CNN receives contractual rights to Travelot's intellectual property, but Travelot receives no rights to CNN's property.

Lastly, CNN points to provisions entitled "Ownership" and "Trademarks," which state in their entirety:

> 1. *Ownership.* General [sic] all intellectual and rights of a party hereby *expressly are reserved to and shall remain vested in that party as otherwise expressly granted by this Agreement.* Company acknowledges and agrees that CNN owns the CNN Sites, the respective logos and all other trademarks and/or service marks related to the CNN Sites (the "Logos") and covenants and agrees that *it will not use the Logos without the prior written consent of CNN.* All rights in the Logos and the goodwill associated therewith will remain at all times the property of CNN. CNN may withdraw consent for Company's use of the Logos immediately if Company breaches any term of the Agreement or condition contained herein or if CNN, in its reasonable discretion, deems such termination necessary or advisable.

> 7. *Trademarks.* Each party hereby covenants and agrees that the trademarks, trade names, service marks, copyrights and other proprietary rights owned by the other party are and shall remain the sole and exclusive property of that party and neither party shall hold itself out as having any ownership rights with respect to or, *except as specifically granted hereunder,* in any and exclusively to the benefit of the owner thereof. Such property of the other party shall only be used *as and if expressly provided in this Agreement.*

Terms and Conditions ¶¶ 1, 7 (emphases added).

Neither of the above provisions grants Travelot a license to use CNN's logos. Travelot receives nothing more than the virtually meaningless privilege to request permission to use CNN's logos: "Company [Travelot] acknowledges and agrees that ... it will not use the [CNN] Logos without the prior written consent of CNN," *id.* ¶ 1. Moreover, the "Trademark" provision states that all rights exist only "as and if expressly provided" in the Contract, *id.* ¶ 7, and the "Ownership" paragraph states that all the intellectual property rights of each party to the Contract "expressly are reserved to and shall remain vested in that party," *id.* ¶ 1, which recitals imply that the Contract had granted all the rights the parties intended to grant. These recitals thus effectively douse the heretofore flickering flame of implication in paragraph 3.3 of the Term Sheet that some "authorized use" of CNN's marks was to be granted Travelot in the Contract.[3]

Furthermore, the terms of the Contract effectively preclude any inference that a

---

**3.** The Contract provides that "in the event of conflict between defined terms contained in ... the Terms Sheet and [those in] the Terms and Conditions, the Term Sheet shall govern." Travelot's Ex. B (Acquisition Agreement letter). Paragraphs one and seven in the Terms and Conditions are clearly not contradicted, even impliedly, in the Term Sheet, which did not grant a trademark license.

trademark license grant to Travelot was *implied.* In the first place, all indications are that where the drafters of the Contract intended to grant a license, they did so with specificity and clarity. They were apparently aware of the impact of the word "grant," as shown both by the express "grant" of rights in Travelot's intellectual property to CNN, *see* Term Sheet ¶ 1.1 ("Company hereby grants CNN a non-exclusive right to use, publish and display its ... graphical logos ...."); *id.* ¶ 3.3 ("Company hereby grants CNN a limited non-exclusive license to use the [Travelot] logo and any other [Travelot] marks, logotypes, or brand identifiers as [Travelot] may provide to CNN ...."), and by the details addressing the scope of said grant, *see id.* ¶ 3.3 ("Such license is granted solely in connection with CNN's rights and obligations under this Agreement and, in particular, for the purpose of permitting CNN to display the [Travelot] Logo in the travel sections of the CNN Sites and on any other pages of the CNN Sites or any affiliated websites from which the Travel Content may be accessed."). In notable contrast, there is no provision in the Contract describing the scope and limitations of any implied grant of CNN's marks to Travelot. Thus, the presence of specific granting language in the Contract with respect to CNN's receipt of Travelot's trademark license negates the notion that Travelot was to be the implied recipient of CNN's trademark license.

Secondly, CNN's contractual retention of control over the manner in which Travelot was to present its product on the CNN website is not sufficient to imply that CNN granted to Travelot a license in its trademark. For a trademark licensor to retain ownership of its marks, that licensor must retain control over the scope and manner of the mark's licensed use; thus, language of control coupled with language granting a trademark license is to be ex-

pected. CNN now contends that its contractual retention of control over its marks evidences that a license grant was intended. In light of this contention, it is necessary to reiterate that a trademark license is, essentially, a grant of permission to use the grantor's mark without fear of being sued for infringement. *See Bunn–O–Matic,* 88 F.Supp.2d at 920–21; *In re Impact Distribs.,* 260 B.R. at 54. If CNN had granted a license to Travelot, it would necessarily have had to retain control over any product held out under its mark. This does not mean, however, that every contract in which the owner of a mark seeks to retain control of its mark necessarily grants a trademark license. If CNN had intended to license its mark to Travelot, it could have simply said so.

Third, the association between Travelot and CNN's logos was a Contract requirement, not a license grant. The Contract states that "[Travelot] *agrees* that the Travel Content *will have* certain CNN navigation and branding," Term Sheet ¶ 3.1 (emphasis added). Also, the Contract terms require Travelot, at its own expense, to update the look-and-feel of its Travel Content so as to be visually compatible with any CNN site design changes as they occur. *Id.* ¶ 3.2.

Fourth, there was no implied grant of a license arising from the terms providing for placement of Travelot's Travel Content on CNN's website. It is true, of course, that Travelot planned to benefit from its association with CNN. It is also true that courts have held that good will and trademarks go hand in hand, at least to the extent that an attempted transfer of a trademark is void without a transfer of the good will associated with the trademark. *See* Lanham Act, 15 U.S.C. § 1060(a) ("A registered mark ... shall be assignable with the good will of the business in which the mark is used, or with that part of the

good will of the business connected with the use of and symbolized by the mark."); *Patterson Labs., Inc. v. Roman Cleanser Co. (In re Roman Cleanser Co.)*, 802 F.2d 207, 208 (6th Cir.1986) (noting that "marks are assignable *only* 'with the good will of the business in which the mark is used'" (emphasis added)). It does not follow, however, that because a trademark licensee benefits from the good will associated with a trademark, every beneficiary of good will necessarily becomes a trademark licensee.[4]

Fifth, the contract terms are actually inconsistent with the granting of a trademark license. Any use of the CNN logos not *required* under the Contract is conditioned upon CNN's prior written consent, *see* Terms and Conditions ¶ 1, and CNN effectively reserved *"[a]ll* rights in [its] Logos and the goodwill associated therewith," *id.* ¶ 1 (emphasis added), even to the point of requiring Travelot to ask permission to use the marks, *id.*

Finally, and of primary importance, the Terms and Conditions recites that "property of the other party shall *only* be used as and if *expressly* provided in this agreement." Terms and Conditions ¶ 7 (emphases added). This language alone precludes any finding of an implied license.

*5. Conclusion: The Contract does not contain a trademark license grant to Travelot.*

Assuming as true, and self-evident, that ferocious protection of CNN's mark is an essential role of CNN's management and legal team, I conclude that the contract in question does not grant a trademark license to Travelot. If CNN intended to grant a trademark license to Travelot in the Contract, then employing the word "grant" would have sufficed rather elegantly. In its absence, any intent to grant a trademark license is woefully, and fatally, obscure. It appears that verbiage lacking the clarity of the word "grant" is now being manipulated and reinterpreted so as to present it as being something more than the scriveners ever intended. Such verbiage cannot now propel the Contract into the safe harbor afforded in § 365(c).

## B. 11 U.S.C. § 1112(b): Dismissal for Cause—Lack of Good Faith in Filing

Generally, "on request of a party in interest ... and after notice and a hearing, the court ... may dismiss a case under this chapter ... for cause...." 11 U.S.C. § 1112(b) (listing nine examples of "cause"); *see also Albany Partners, Ltd. v. Westbrook (In re Albany Partners, Ltd.)*, 749 F.2d 670, 674 (11th Cir.1984) (noting that, in addition to factors listed in § 1112(b), court may consider other factors peculiar to given case in using its equitable powers to reach appropriate result). "Cause" for dismissing a case under § 1112(b) includes a debtor's lack of good faith in filing. *Id.* Indicative of lack of good faith in filing is a debtor's intent to abuse the judicial process and the purposes of the reorganization provisions, "particularly when there is no realistic possibility of an effective reorganization" or

---

4. As an example of the inherent lack of logic in such an implication, consider the rights obtained by an entity which contracts with a shopping mall to place a kiosk in the mall's main aisle. The contracting entity certainly plans to benefit from the established good will of the mall by drawing mall customers into the mall where it is hoped that they will then notice and visit the kiosk; yet, that entity does not receive a license in the mall's trademarks solely by virtue of receiving permission to place its kiosk on mall property. That Travelot similarly planned to benefit from the good will associated with the CNN name by placing its Travel Content on the CNN website in accordance with CNN's rules and restrictions does not translate into the receipt of a trademark license in CNN's marks.

where it is evident that "the debtor seeks merely to delay or frustrate the legitimate efforts of secured creditors to enforce their rights." *Id.*

The Eleventh Circuit, in *Phoenix Piccadilly, Ltd. v. Life Ins. Co. of Va. (In re Phoenix Piccadilly, Ltd.)*, 849 F.2d 1393 (11th Cir.1988), affirmed a bankruptcy court's finding of bad faith based on the presence of six non-exclusive factors. *See id.* at 1394–95. The factors were:

(I) The Debtor has only one asset, the Property, in which it does not hold legal title;

(ii) The Debtor has few unsecured creditors whose claims are small in relation to the claims of the Secured Creditors;

(iii) The Debtor has few employees;

(iv) The Property is the subject of a foreclosure action as a result of arrearages on the debt;

(v) The Debtor's financial problems involve essentially a dispute between the Debtor and the Secured Creditors which can be resolved in the pending State Court Action; and

(vi) The timing of the Debtor's filing evidences an intent to delay or frustrate the legitimate efforts of the Debtor's secured creditors to enforce their rights.

*Id.* (citing, *inter alia, Little Creek Dev. Co. v. Commonwealth Mortgage Corp. (In re Little Creek Dev. Co.)*, 779 F.2d 1068, 1073 (5th Cir.1986)).

In addition to the factors noted in *Phoenix Piccadilly*, bankruptcy courts in this circuit have identified additional factors as possible indicators of bad faith, including: (I) creation of a debtor for the purpose of acquiring property and protecting that property under the automatic stay, *Home Fed. Sav. v. Club Candlewood Assoc. (In re Club Candlewood)*, 106 B.R. 752, 755 (Bankr.N.D.Ga.1989); (ii) a debtor's use of the bankruptcy process to create and organize a new business, id.; (iii) the appearance that a debtor is merely a shell corporation, *In re Punta Gorda Assocs.*, 143 B.R. 281, 283 (Bankr.M.D.Fla.1992); (iv) the filing of a previous bankruptcy petition, *Northwest Place, Ltd. v. Cooper (In re Northwest Place, Ltd.)*, 73 B.R. 978, 981 (Bankr.N.D.Ga.1987); (v) the absence of pressure on the debtor from non-moving creditors, id.; (vi) the debtor's improper prepetition conduct, id.; (vii) the effect of the petition is to allow the debtor to evade court orders, id.; and (viii) no possibility of reorganization, id.

■ CNN asserts that all six of the factors sufficient for the bad-faith finding in *Phoenix Piccadilly*, as well as three of the other factors identified by bankruptcy courts in this Circuit, are present in this case. These factors emerged on a case-by-case basis out of the particular facts presented to the courts which adopted them, and none is dispositive of lack of good faith in this or any other case. Instead, they are available to bankruptcy courts for whatever analytical value they offer within the framework of the particular case in assessing the totality of circumstances. Mindful of the ultimate test of bad faith—filing in order to frustrate the legitimate efforts of creditors, with no realistic expectation of reorganization, thereby abusing the judicial process—the Court alludes to the factors only insofar as they shed light on the issue of good faith under the totality of the circumstances.

■ Travelot was an "established" business at the time it petitioned for Chapter 11 protection, in the sense that substantial money, effort, and time had been expended, and that an important agreement had been negotiated and executed, the implementation of which was imminent at the time of filing. Travelot had expended $500,000 in readying itself to implement its objective and had achieved mutual exe-

cution of the Contract as a result. At the time of filing, the business had prospective expectation of success, but that expectation rested in implementation of the Contract. Moreover, Travelot was no less viable for lack of employees; indeed, at the time of filing, employees were not required to satisfy Travelot's obligations to CNN, and Isaacson's expertise was available at all times. The meager funds in Travelot's bank account is similarly unremarkable. Mr. Isaacson testified that he offered to pay into an escrow account the amounts due CNN under the Contract while CNN and Travelot worked out their problems, and he also testified that he had additional funding available on a short timetable. The totality of these facts show that Travelot was not merely a shell corporation.

In addition, that Travelot's only creditors are CNN and a potential equity holder and that the case involves essentially a two-party dispute does not alter my finding. Had Travelot's rights under the Contract been terminated, its prospects as a viable entity would have been destroyed; therefore, that the threat of termination prompted Travelot's filing does not indicate a bad faith filing.[5]

Finally, even though Travelot's primary property-the Contract-was on the verge of cancellation, the fact that Travelot filed less than one hour before its rights were to be terminated does not indicate bad faith under the facts of this case. There is evidence that Travelot attempted to communicate regularly with CNN, that CNN may have delayed in providing mockups and a media plan to Travelot, and that CNN may have avoided meaningful discussion of the GDS issues while allowing the fifteen-day cure period to run; therefore, the timing of the filing, although accomplished at the last minute before Travelot's rights under the Contract expired, was clearly not a bad faith attempt to delay or frustrate creditors in enforcing their rights. Rather, Travelot's decision to file was an attempt to keep its business viable and to avail itself of the breathing spell contemplated in Chapter 11 in order to resolve the issues that could not be solved during the limited time between Travelot's realization that no meaningful communication was taking place and the cure deadline.

When Travelot filed its case, its survival was on the line. Its intention in filing was clearly to preserve itself, rather than to frustrate CNN, regardless of the effect of the filing on CNN's rights to terminate the Contract.[6] I conclude, therefore, that Travelot filed its case in good faith.

## C. 11 U.S.C. § 365(b): Curing Defaults

▇▇▇ CNN asserts that Travelot defaulted under the Contract and that Travelot is unable to cure the defaults. Where a debtor has defaulted under the terms of an executory contract prior to filing its case, the Bankruptcy Code requires the debtor to cure such defaults:

> If there has been a default in an executory contract … of the debtor, the trustee may not assume such contract

---

**5.** Compare Travelot's motive in filing with that of the debtor in *Albany Partners,* whose sole officer and equity holder created the debtor in order to stay imminent foreclosure and to receive title to real property. 749 F.2d at 674 (finding lack of good faith).

**6.** Compare Travelot's objective with that of the debtor in *In re Club Tower,* whose "only

objective in filing … was to delay and frustrate the efforts of [a creditor] to enforce its rights and remedies as a secured creditor," and who, after agreeing to convey title to its creditor if it could not raise needed capital, filed because it was unsuccessful in raising needed equity to honor that agreement. 138 B.R. at 310 (finding lack of good faith).

... unless, at the time of assumption of such contract ..., the trustee—

(A) cures, or provides adequate assurance that the trustee will promptly cure, such default;

(B) compensates, or provides adequate assurance that the trustee will promptly compensate, a party other than the debtor to such contract ..., for any actual pecuniary loss to such party resulting from such default; and

(C) provides adequate assurance of future performance under such contract ....

§ 365(b)(1); *see also Worthington v. Gen. Motors Corp. (In re Claremont Acquisition Corp.)*, 113 F.3d 1029, 1033 (9th Cir. 1997) ("In general, a debtor must cure all defaults, both monetary and non-monetary, prior to the assumption and assignment of an executory contract."). Thus, the DIP in the present case, acting as trustee, may assume the Contract only if the DIP provides adequate assurance of a prompt cure and of future performance.

CNN asserts that Travelot defaulted when it failed to pay CNN $750,000.00 and disclosed confidential information to third parties without CNN's prior consent. CNN further asserts that curing the defaults is not possible because, first, the DIP has no funds to provide a monetary cure and cannot provide adequate assurance of future performance under the Contract and, second, the alleged confidentiality breach is incurable after the fact.

I find CNN's argument to be premature at this stage. The issues with respect to possible default and cure will be addressed after, and if, the Debtor–in–Possession moves to assume the Contract. At that point, the Court, if the motion is granted, will exercise its broad powers to require timely and substantial guarantees of cure and future performance in the context of any order on the assumption of the Contract so as to assure CNN of a reliable contracting partner.

### *ORDER*

Pursuant to the above: (1) The Travelot Company as Debtor–in–Possession IS NOT PRECLUDED as a matter of law from attempting to assume the contract with CNN by application of 11 U.S.C. § 365(c); and (2) the request by Turner Broadcasting Sales, Inc. to dismiss The Travelot's Company's Chapter 11 case IS DENIED.