In re N.C.P. MARKETING GROUP, INC., et. al., Debtors.

N.C.P. Marketing Group, Inc., et. al., Appellant,

v.

Billy Blanks, Gayle Blanks, and BG Star Productions, Appellees.

Civ. No. CV–N–04–0750–ECR (RAM).
Bankruptcy No. 04–51071–GWZ.

United States District Court, D. Nevada.

Nov. 21, 2005.

---

Jennifer A. Smith, Lionel, Sawyer & Collins, Reno, NV, Brian A. Bash, Baker & Hostetler LLP, Cleveland, OH, for Plaintiff.

Michael A.T. Pagni, McDonald Carano Wilson LLP, Reno, NV, Michael S. Greger and Jeanne M. Jorgensen, Allen Matkins Leck Gamble & Mallory, LLP, Irvin, CA, for Defendant.

### ORDER

EDWARD C. REED, JR., District Judge.

## I. Procedural Background

This is an appeal from an order of the Bankruptcy Court for the District of Nevada granting Appellee's Motion to Compel Rejection of Nonexclusive Trademark License.

Appellant N.C.P Marketing Group ("NCP" or "Appellant") filed a Notice of Appeal of Rejection Order (Appeal # 0424) on November 18, 2004. Appellees, Billy Blanks, Gayle Blanks, and BG Star Productions ("the Blanks" or "Appellees"), then filed a Notice of Election To Have Appeal Heard by District Court (# 3) on December 17, 2004. Appellant then filed an Opening Brief (# 6) on July 29, 2005. Appellees filed a Brief (# 8) on August 30, 2005 and Appellant responded (# 11) on September 16, 2005.

The appeal is now ripe and we enter our order with respect to it.

## II. Factual Background

This appeal stems from ongoing litigation between NCP and the Blanks concerning trademark licensing agreements.

The Blanks are the creators of Tae Bo®, which is claimed to be a revolutionary total body fitness system. This system includes videotapes sold in retail chains and through television shopping networks. Appellees Billy Blanks and Gayle Blanks, through BG Star, own the Tae Bo® and Billy Blanks® tradenames and other related trademarks.

On August 31, 1999, NCP and the Blanks entered into an agreement ("Original Agreement") giving NCP the right to advertise and sell products and services containing the Blanks' trademark, Tae Bo®. It was not long after the Original Agreement was entered into that the parties got into a dispute about their relative obligations under the agreement. On October 3, 2001, the parties entered in a Settlement Agreement confirming the Blanks' ownership of the Tae Bo® trademark. Subsequent to the signing of the Settlement Agreement, on June 20, 2002, the parties signed a License Agreement which detailed how NCP was to use the Blanks' trademark in marketing

and selling products. Both the License Agreement and Settlement Agreement supercede the Original Agreement and the Settlement and License Agreements contain the rights concerned in this dispute.

It was not long after the signing of the License Agreement and the Settlement Agreement that NCP materially breached both agreements by not paying the Blanks the required amount of royalties. The Blanks instituted arbitration for this breach. The arbitrator in this dispute held that because NCP had failed to pay the obligatory amount of royalties, the License Agreement and Settlement Agreement had been breached. The arbitrator ordered the NCP to pay the Blanks $2.1 million in royalties. NCP failed to pay that amount and on April 13, 2004, filed for Chapter 11 Bankruptcy.

In the Chapter 11 Bankruptcy proceedings, NCP filed a "Disclosure Statement for Joint Plan of Reorganization" in which NCP claimed to be the "owner[s] of the Tae Bo brand trademarks." Under 11 U.S.C. § 365 of the Bankruptcy Code, NCP, as a debtor in bankruptcy proceedings, may either assume, assume and assign, or reject executory contracts and unexpired leases of real and personal property, subject to the approval of the Bankruptcy Court. However, there is an exception to this rule in § 365(c)(1) which prohibits the assumption by a debtor of property rights if the original owner of the property would have been able, under applicable federal law, to reject performance from a third party.

The Blanks' disputed the ownership of their trademarks and the ability for NCP to assume the trademark in bankruptcy proceedings and, on September 21, 2004, filed a Motion for Order Compelling Rejection of Nonexclusive Trademark License contesting such ownership. The Blanks contended that NCP did not own such rights as all agreements had been terminated, and even if NCP did own such rights, under applicable federal law, any rights were non-assumable and NCP could therefore not issue such licenses in further bankruptcy proceedings.

On October 19, 2004, a hearing was held by the Bankruptcy Court on the Blanks' motion. The Bankruptcy Judge entered an oral ruling granting the Motion. On November 15, 2004, the Bankruptcy Judge entered a written order ruling that the License and Settlement Agreements did "not give [NCP] permission to assign rights to any other party."

## III. Standard of Review

This court has jurisdiction to hear this appeal pursuant to 28 U.S.C. § 158. We review the Bankruptcy Court's decision by applying the clearly erroneous standard to the findings of fact and the de novo standard to conclusions of law. *In re Park–Helena Corp.*, 63 F.3d 877, 880 (9th Cir.1995).

NCP makes two arguments as to why the Bankruptcy Court erred in granting the Blanks' motion. First, NCP argues that it was not required to show it had received consent from the Blanks to license the Blanks' trademark to third parties because trademark law does not specifically excuse the licensor from accepting performance from a person other than the original licensee. Second, NCP argues that even if trademark law did make such an excuse for the licensor, NCP had consent to license the trademark from rights derived from the Settlement and License Agreements.

We agree with the Bankruptcy Judge and hold that the Appellant had no rights to the Blanks' trademark that were as-

sumed by NCP in its bankruptcy proceedings.

### 1. Section 365(c)(1)[1]

■ A debtor in possession, as well as a trustee, may, subject to the bankruptcy court's approval, "assume any executory contract from itself as debtor." *City of Jamestown v. James Cable Partners, L.P. (In re James Cable Partners, L.P.)*, 27 F.3d 534, 537 (11th Cir.1994)(holding that debtors in possession generally have rights, powers, and duties of trustees) (applying 11 U.S.C. § 365(a)); *K–4, Inc. v. Midway Engineered Wood Prods. (In re TreeSource Indus.)*, 363 F.3d 994, 997 (9th Cir.2004); *Perlman v. Catapult Entertainment, Inc. (In re Catapult Entm't, Inc.)*, 165 F.3d 747, 749 (9th Cir.1999). Thus, executory contracts can be assumed by the debtor in possession, or the trustee, of the bankruptcy estate under section 365. This general rule is subject to certain conditions stated in section 365(c)(1):

> (c) The trustee may not assume or assign any executory contract . . . of the debtor, whether or not such contract . . . prohibits or restricts assignment of rights or delegation of duties, if—
>
> > (1)(A) applicable law excuses a party, other than the debtor, to such contract . . . from accepting performance from or rendering performance to an entity other than . . . the debtor in possession, whether or not such contract . . . prohibits or restricts assignment of rights or delegation of duties; and
> >
> > (B) such party does not consent to such assumption or assignment.

Section 365(c)(1) of the Bankruptcy Code has been the subject of much controversy between circuits, as courts have differed on how to interpret this provision.

The first interpretation, called the "hypothetical test," adheres strictly to the plain statutory language in examining whether, hypothetically without looking to the individual facts of the case, any executory contracts could be assumed under applicable federal law. *In re Catapult*, 165 F.3d, at 749–50 (citing *In re James Cable Partners*, 27 F.3d at 537; *In re West Elec. Inc.*, 852 F.2d 79, 83 (3d Cir.1988); *Breeden v. Catron (In re Catron)*, 158 B.R. 629, 633–38 (E.D.Va.1993)). The other interpretation is called the "actual test" which looks at whether the executory contract at hand, in actuality, can be assumed when applying the applicable federal law. *Institut Pasteur v. Cambridge Biotech Corp.*, 104 F.3d 489, 493 (1st Cir.1997), *cert. denied*, 521 U.S. 1120, 117 S.Ct. 2511, 138 L.Ed.2d 1014 (1997). The Ninth Circuit adopted the "hypothetical test" interpretation in *In re Catapult*, 165 F.3d at 750. In looking at the "plain language" of section 365(c)(1), the Ninth Circuit held that "a debtor in possession may not assume an executory contract over the non-debtor's objection if applicable law would bar assignment to a hypothetical third party, even where the debtor in possession has

---

1. As a preliminary matter, we reject the Blanks' claim that NCP cannot raise the applicability of *In re Catapult* to trademark licenses here on appeal. In the cases that the Blanks cite, a new issue involves application of a statute that has not been raised in the bankruptcy proceedings below-not a different interpretation of a case that is applicable to the facts. *See In re Cybernetic Servs., Inc.*, 252 F.3d 1039, 1045 n. 3 (9th Cir.2001) (rejecting Appellant's argument relying on a new section of the Bankruptcy Code as waived). In any case, we retain discretion to hear new arguments in this court. *El Paso City v. Am. W. Airlines, Inc. (In re Am. W. Airlines, Inc.)*, 217 F.3d 1161, 1165 (9th Cir.2000) (noting, in an appeal from the Bankruptcy Court, that, "absent exceptional circumstances, we generally will not consider arguments raised for the first time on appeal, although we have discretion to do so.").

no intention of assigning the contract in question to any such third party." *Id.* (citations omitted).

█ The parties do not dispute the proposition that the licensing of the Blanks' trademark was an executory contract or that trademark law is "applicable federal law" for purposes of section 365(c)(1). However, they dispute whether applicable trademark law would bar assignment to a third party without consent of the assignor.

Whether under the federal common law of trademarks a licensor would have the power to reject "performance by an entity other than the debtor" appears to be an issue of first impression in this circuit. However, the Ninth Circuit and other circuits have come to the conclusion that two other forms of intellectual property, copyrights and patents, are personal and assignable only with the consent of the licensor and therefore unassumable under section 365(c)(1). *See In re Catapult*, 165 F.3d at 750 (holding that applicable federal patent law made patents personal and unassignable without consent of the licensor); *In re Golden Books Family Entm't, Inc.*, 269 B.R. 300, 307–10 (Bankr.D.Del.2001)(addressing copyright licenses as personal and unassignable without consent); *RCI Tech. Corp. v. Sunterra Corp. (In re Sunterra Corp.)*, 361 F.3d 257, 266 (4th Cir.2004)(same); *In re BuildNet, Inc.*, 2002 Bankr.LEXIS 1851, at *14–15 (Bank.M.D.N.C.2002)(same). The issue at hand is whether to extend this reasoning to another form of intellectual property: trademarks.

NCP claims that patents and copyrights are fundamentally different than trademarks.[2] It claims that since trademark law was designed to protect the consumer from deception and confusion and not the interests of the trademark holder, third party performance that adheres to the terms of the license should not run afoul of trademark law.

**2.** NCP cites two law review articles for the proposition that trademark law is "different" from patent and copyright law and why such differences would necessitate a different result under section 365. Madlyn Gleich Primoff & Erica G. Weinberger, *E–Commerce and Dot–Com Bankruptcies: Assumption, Assignment and Rejection of Executory Contracts, including Intellectual Property Agreements, and Related Issues Under Sections 365(c), 365(e) and 365(n) of the Bankruptcy Code*, 8 Amer. Bankr.Inst. L.Rev. 307, 327 (2000) ("the application of section 365(c) to trademark licenses is less clear"); Risa Lynn Wolf–Smith, *Bankruptcy Considerations in Technology Transactions,* 23–Apr. Amer. Bankr.Inst. J. 32, n. 1 (2004) ("Note that trademark law is distinguishable and permits unauthorized assignment of executory contracts. Courts have concluded that unauthorized assignment does not necessarily implicate infringement unless the use of the trademark by the assignee is likely to confuse, cause mistake or deceive consumers."). However, other legal scholars have come out on the other side arguing that a trademark license is personal and not assignable without the consent of the licensor. *See* Gregory G. Hesse, *The Risk of an Offensive Use of Catapult*, 20–Apr. Amer. Bankr.Inst. J. 14, 16 (2001) ("The rationale for restricting the transferability of non-exclusive patents also applies to trademarks and copyright. The owner of a trademark or copyright should be allowed to enjoy the benefits of its creativity without having to worry that a licensee will assign the rights to the trademark or copyright to an entity with which the trademark or copyright owner would refuse to conduct business, such as a competitor or (in the perception of a trademark or copyright owner) an unqualified entity....[Therefore] both a trademark license and copyright license...[are] personal and non-delegable..."); *and* Michelle Morgan Harner, Carl E. Black and Eric R. Goodman, "Debtors Beware: The Expanding Universe of Non–Assumable/Non–Assignable Contracts in Bankruptcy." 13 Am. Bankr.Inst. L.Rev. 187, 221 (2005) ("The grant of a trademark license generally is considered personal to the licensee and cannot be freely transferred to a third party under federal common law.").

However, NCP mischaracterizes what constitutes the value of a trademark and the purpose of trademark law. While trademarks are used to protect the public from confusion, they are also used by trademark owners to protect themselves from unauthorized use of their mark, and they are used by trademark owners to preserve the value of their business name and products.

 Trademark rights are intangible property rights because their primary feature and value are consumers' perceptions of the mark. *Power Test Petroleum Distribs., Inc. v. Calcu Gas, Inc.*, 754 F.2d 91, 96 (2d Cir.1985) ("The metes and bounds of a trademark are defined by the perceptions that exist in the minds of the relevant buying public."). Trademarks are valuable property rights that allow their owners to protect the good will of their name and products by preventing unwarranted interference and use of their mark by others. *Stork Restaurant v. Sahati*, 166 F.2d 348, 354 (9th Cir.1948). As a grant of *permission* to use another's mark, the trademark owner has a significant interest in controlling to whom the mark is transferred because the subsequent value of the trademark will be based entirely on good will. *Id.* Good will and trademarks "go hand in hand, at least to the extent that an attempted transfer of a trademark is void without transfer of the good will associated with the trademark." *In re Travelot Co.*, 286 B.R. 447, 458 (Bankr.S.D.Ga.2002). Indeed, the Lanham Act provides that "a registered mark...shall be assignable with the good will of a business in which the mark is used." The trademark owner not only has a right to assign a trademark, but the same owner also maintains a right and duty to control the quality of goods sold under the mark. 15 U.S.C. § 1060. Because the owner of the trademark has an interest in the party to whom the trade-

mark is assigned so that it can maintain the good will, quality, and value of its products and thereby its trademark, trademark rights are personal to the assignee and not freely assignable to a third party. J. Thomas McCarthy, 4 *McCarthy on Trademarks and Unfair Competition* § 25.33 (4th ed.2005)("since the licensor-trademark owner has the duty to control the quality of goods sold under its mark, it must have the right to pass upon the abilities of new potential licensees.").

Other courts, including one within this circuit, as well as a prominent treatise on trademarks, agree with this conclusion. In *Miller v. Glenn Miller Productions*, the Central District of California held that "copyright and trademark licensors share a common retained interest in the ownership of their intellectual property—an interest that would be severely diminished if a licensee were allowed to sub-license without the licensor's permission." 318 F.Supp.2d 923, 928 (C.D.Cal.2004); *see also In re Travelot Co.*, 286 B.R. at 455 ("The grant of a non-exclusive license is 'an assignment in gross,' that is, one personal to the assignee and thus not freely assignable to a third party..." (citations omitted)); *Tap Publ'ns, Inc. v. Chinese Yellow Pages (New York) Inc.*, 925 F.Supp. 212, 218 (S.D.N.Y.1996) ("The general rule is that unless the license states otherwise, the licensee's right to use the licensed mark is personal and cannot be assigned to another."); *Visa Int'l Serv. Ass'n v. Bankcard Holders of Am.*, 211 U.S.P.Q. 28, 41 (N.D.Cal.1981) ("Member banks may not assign their contractual right to use the VISA logo in an unauthorized manner without the consent of the licensor."); J. Thomas McCarthy, 4 *McCarthy on Trademarks and Unfair Competition* § 25.33 (4th ed. 2005) ("While the case law is sparse, it appears to be the rule that unless the license states

otherwise, a license mark is personal and cannot be assigned.").

Because we find that under applicable trademark law, trademarks are personal and non-assignable without the consent of the licensor, the Blanks' trademark would be unassumable as part of the bankruptcy estate of NCP without the Blanks' consent.

**2. Settlement and License Agreements**

■ NCP argues that the Bankruptcy Court erred when it determined that the Blanks did not consent to the assignment of the licenses, because it failed to interpret the Settlement and License Agreements correctly. However, we concur with the Bankruptcy Court's interpretation and hold that the Blanks did not consent to such an assignment.[3]

■ "The fundamental goal of contractual interpretation is to give effect to the mutual intent of the parties." *Bank of the West v. Superior Court,* 2 Cal.4th 1254, 1264, 10 Cal.Rptr.2d 538, 833 P.2d 545 (1992). If the contractual language is clear and explicit, it governs. Cal. Civ. Code, § 1638. "On the other hand, if the terms of a promise are in any respect ambiguous or uncertain, it must be interpreted in the sense in which the promisor believed at the time of making it, that the promisee understood it." *Bank of the West,* 2 Cal.4th, at 1264–65, 10 Cal.Rptr.2d 538, 833 P.2d 545.

The arbitration confirmed the termination of the Settlement and License Agreements due to NCP's failure to make any royalty payments under the Settlement Agreement. Finding that the Settlement and License Agreements were terminated, we must determine what happened to the licensing rights that the Blanks had

granted NCP in both the Settlement and License Agreements.

The consequences of termination of the Settlement Agreement are stated in Section 4 of the Settlement Agreement. Under Section 4, if the Blanks did not purchase any of NCP's assets, then Subsection 4(c) would be the source of NCP's rights post-termination. However, Subsection 4(c) grants only those rights that were given to NCP under the License Agreement. Therefore, in order to examine what rights NCP had under the Settlement Agreement's termination provision in Subsection 4(c), we must examine what rights it had under the License Agreement (Exhibit D, as referenced in the Settlement Agreement).

The License Agreement's Section 9 deals with assignment. We note here that while the License Agreement specifies that NCP had a right of "assignment," legally and technically, all NCP had the right to do was to license, not assign. *See Gardner v. Nike,* 279 F.3d 774, 778 (9th Cir.2002). In *Gardner,* the Ninth Circuit held that under the doctrine of indivisibility, the assignment of a copyright necessarily had to include a transfer of ownership rights. *Id.* We find the same thing to be true here. Because the Blanks retained the ownership rights of the trademark and gave NCP a non-exclusive license, NCP only had the right to transfer a non-exclusive license and not to "assign" the trademark in the exclusive sense. *See Ste. Pierre Smirnoff, Fls., Inc. v. Hirsch,* 109 F.Supp. 10, 12 (S.D.Cal.1952)("An exclusive license under trademarks is not a mere license, but assigns the exclusive ownership and good will in the trademarks.")(internal quotation marks and citations omitted).

Section 9 of the License Agreement specifies "Licensee shall have the right to

---

**3.** Here, California contract law will apply as the contract was created under California law and the parties do not dispute the application of California law.

assign, sell, convey or otherwise transfer its rights and obligations under this License Agreement *subject to the terms and conditions of the Settlement Agreement...*" (emphasis added). Therefore, the rights of licensing are then again constrained by the Settlement Agreement. Hence, we must look back to the Settlement Agreement to determine what rights were given to NCP upon termination.

Licensing rights under the Settlement Agreement are defined in Sections 3(k) and 3(*l*). Section 3(k) of the Settlement Agreement reads:

> [NCP] shall have the right to enter into up to (but no more than) fifteen (15) new license agreements with respect to the use of TAE BO Trademarks in connection with goods and services ("New TAE BO License Agreement") ... provided (I) the New TAE BO License Agreements are fully executed by no later than September 30, 2002 (or September 30, 2003, if the term of Agreement extends to calendar year 2003) (ii) the New TAE BO License Agreements are effective no later than September 30, 2002 (or September 30, 2003, if the term of the Agreement extends to calendar year 2003), and are for a term that expires no later than December 31, 2005, unless [NCP] otherwise approves in writing a term of longer duration (such approval not to be unreasonably withheld), (iii)[NCP] shall receive a royalty..."

Section 3(*l*) reads:

> [NCP] shall not enter into any agreements or obligations (and represents and warrants that, to date, it has not entered into any agreements or obli-

gations) that would require [the Blanks] to sell any of the Product through any particular distribution channels for the calendar year 2003 and beyond. Other than New TAE BO License Agreements, [NCP] shall not enter into any new agreements or obligations with respect to the subject matter hereof, including but not limited to agreements imposing obligations on [NCP] regarding TAE BO Trademarks and Products that extend beyond December 31, 2002, without [the Blanks'] prior written consent unless extended to December 31, 2003, if applicable.

We find that the Settlement Agreement defines very specifically which rights NCP would be given for licensing and for what dates such licensing would be valid. Because the consent for licensing expired on December 20, 2002 (or December 20, 2003, whichever is applicable), NCP does not have the consent of the Blanks to license to third parties at this time and therefore cannot assume the trademarks under Section 365(c)(1).[4]

***IT IS HEREBY ORDERED*** that the Bankruptcy Court's Order is **AFFIRMED**.

The Clerk shall enter judgment accordingly.

---

4. We find unpersuasive NCP's argument that the language "in perpetuity" conflicts with specific time restrictions and therefore makes the License Agreement and Settlement Agreement a nullity. Specifically, we note that, under the License Agreement (Exhibit D), which defined the rights extended in perpetuity, there were various other rights that were given to NCP which were not involved in license agreements.